STATE of Iowa, Appellee,

v.

Linda Lou LEGG, Appellant.

No. 00–0225.

Supreme Court of Iowa.

Sept. 6, 2001.

Rehearing Denied Oct. 3, 2001.

* Senior Judge assigned by order pursuant to Iowa Code section 602.9206 (2001).

activated his top lights and "wigwags" located inside the grill. The defendant did not stop, however; rather, she accelerated her car and ran another stop sign.

Killpack continued to follow the defendant's vehicle and, while doing so, noticed that the defendant's car was weaving slowly from curb to curb. After running the second stop sign, the defendant drove another half block before turning into an alley and stopping near a garage. The officer pulled his vehicle in behind the defendant's car, his tops lights and "wigwags" still on. As the officer got out of his car, Legg exited her vehicle and headed toward a door leading into the garage. Following closely behind her, Killpack yelled for the defendant to stop. Legg did not stop and instead opened the door to the garage and went inside. Killpack followed Legg into the garage, taking three steps inside. Throughout this entire incident, Killpack never lost sight of the defendant.

Once inside the garage, Killpack asked Legg to come outside so that he could speak with her. She repeatedly stated, "I'm home." Killpack noticed that her breath smelled of alcohol. He then gently pulled on her coat to "coax" her out of the garage. At that point he could see that her eyes were bloodshot and watery. In addition, Legg had difficulty keeping her balance and her speech was extremely slurred. When Killpack asked to see her license, Legg became angry and attempted to push the officer away from the door so she could go back inside. Killpack then told the defendant he was concerned about

James A. Sinclair of Sinclair & Associates, P.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Karen Doland, Assistant Attorney General, Judson L. Frisk, County Attorney, and Susan Christensen, Assistant County Attorney, for appellee.

TERNUS, Justice.

■ The appellant, Linda Legg, appeals her conviction for operating while intoxicated. *See* Iowa Code § 321J.2 (1999). Her only claim of error is the district court's denial of her motion to suppress. Legg asserts her rights under the Fourth Amendment were violated by a police officer's warrantless entry into her garage, which resulted in her subsequent arrest for operating while intoxicated.[1] *See* U.S. Const.Amend. IV. We affirm.

## I. *Background Facts and Proceedings.*

Because this case was tried on the stipulated minutes of testimony, the facts are largely undisputed. At approximately 12:55 a.m. on February 27, 1999, Logan police officer Jeff Killpack observed the defendant's vehicle run a stop sign in the town of Logan without even slowing down. Killpack pursued the defendant and caught up with her a block later. At that time, he

---

1. The defendant also asserts that her right against unreasonable searches and seizures guaranteed by the Iowa Constitution has been violated. *See* Iowa Const. art. I, § 8. Our court has generally interpreted this provision of the Iowa Constitution to have the same scope and purpose as the Fourth Amendment. *See State v. Breuer,* 577 N.W.2d 41, 44 (Iowa 1998). The defendant has offered no reason to distinguish the state constitutional guarantee from the federal provision as it has been interpreted by the United States Supreme Court with respect to the issue before us. Therefore, our discussion of the Fourth Amendment applies equally to the state constitutional claim.

her intoxication and asked her to go with him to the law enforcement center. When she refused to cooperate, he placed her in handcuffs and informed her she was under arrest for operating while intoxicated (OWI). Once they arrived at the law enforcement center, Legg refused to perform field sobriety tests and refused to take a preliminary breath test.

Legg was charged with OWI, first offense, and interference with official acts, both serious misdemeanors.[2] *See* Iowa Code §§ 321J.2, 719.1. In addition, she was ticketed for failure to stop. *See id.* § 321.256. Legg's pre-trial motion to suppress was denied. The misdemeanor charges then proceeded to a bench trial on the stipulated minutes of testimony. The court found the defendant guilty of both crimes. Legg was sentenced to seven days in jail and fined $1000 for the OWI offense. On the conviction for interference with official acts, the court sentenced Legg to one day in jail to be served concurrently with the prior sentence. The court then suspended five days of the OWI sentence and placed the defendant on conditional unsupervised probation for one year.

■ Legg appeals. She raises only one issue: whether the trial court erred in denying her motion to suppress. Legg argues Killpack's warrantless entry into her garage violated the Fourth Amendment, requiring suppression of any evidence obtained thereafter. She claims Killpack acted unreasonably because he did not have probable cause to arrest her for OWI and there were no exigent circumstances to justify his entry into her garage without a warrant. The State contends that Legg had no legitimate expecta-

tion of privacy in her garage and that, even if she did, the officer did not unreasonably invade that interest. We review this constitutional claim de novo. *See State v. Halliburton,* 539 N.W.2d 339, 341 (Iowa 1995).

## II. *General Legal Principles.*

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In interpreting this provision of the Constitution, the United States Supreme Court has stated that "the Fourth Amendment's proper function is to constrain, not against all intrusions ... but against intrusions which are *not justified in the circumstances,* or which are made in an improper manner." *Schmerber v. California,* 384 U.S. 757, 768, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908, 918 (1966) (emphasis added). Similarly, this court has noted that

> [t]he essential purpose of the proscriptions of the Fourth Amendment "is to impose a standard of *'reasonableness'* upon the exercise of discretion by government officials, including law enforcement agents[,] in order 'to safeguard the privacy and security of individuals against arbitrary invasion....'"

*State v. Loyd,* 530 N.W.2d 708, 711 (Iowa 1995) (emphasis added) (quoting *Delaware v. Prouse,* 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667 (1979)); *accord State v. Breuer,* 577 N.W.2d 41, 45 (Iowa 1998) (stating "the Fourth Amendment protects only against *unreasonable*

---

**2.** After the events giving rise to the present case, the legislature amended section 719.1(1) to make the crime of interference with official acts a simple misdemeanor, subject to a fine of at least $250.00 but no more than $500.00 and/or imprisonment not to exceed thirty days. *See* 1999 Iowa Acts ch. 153, §§ 21, 24 (codified at Iowa Code §§ 719.1(1), 903.1(1)(*a*) (Supp.1999)).

government intrusion upon a person's legitimate expectation of privacy" (emphasis added)).

■ To protect citizens against unreasonable searches and seizures, the Fourth Amendment requires that the government must obtain a warrant before it may search or enter an area in which a person has a reasonable expectation of privacy. *See Breuer*, 577 N.W.2d at 45. Searches conducted without a warrant are per se unreasonable, unless the government action falls within one of a few, well-recognized exceptions. *See Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967). These exceptions include "searches based on consent, plain view, [or] exigent circumstances and searches incident to arrest." *Breuer*, 577 N.W.2d at 45.

■ In determining whether there has been a Fourth Amendment violation, this court has adopted a two-step approach. *See id.* First, we decide whether the person challenging the search has shown a legitimate expectation of privacy in the area searched. *See id.; accord Minnesota v. Carter*, 525 U.S. 83, 91, 119 S.Ct. 469, 474, 142 L.Ed.2d 373, 379 (1998). If so, we then "consider whether the State has unreasonably invaded that protected interest." *Breuer*, 577 N.W.2d at 45. Our evaluation of the reasonableness of a search is made using an objective standard. *See State v. Cline*, 617 N.W.2d 277, 280–81 (Iowa 2000). "Consequently, the legality of a search and seizure ... 'does not depend on the actual motivation of the individual officers involved.'" *Id.* at 281 (quoting *State v. Predka*, 555 N.W.2d 202, 205 (Iowa 1996)).

III. *Legitimate Expectation of Privacy.*

■ The first issue we must decide is whether Legg had a legitimate expectation of privacy in her garage. The United States Supreme Court has observed that

the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Katz*, 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582 (citations omitted). Whether a person has a legitimate expectation of privacy concerning a specific area is made on a case-by-case basis, considering the unique facts of each situation. *See Breuer*, 577 N.W.2d at 46.

■ Notwithstanding a generally case-by-case approach, it is well established that persons have a legitimate expectation of privacy in their homes. *See Schmerber*, 384 U.S. at 770, 86 S.Ct. at 1835, 16 L.Ed.2d at 919 ("Search warrants are ordinarily required for searches of dwellings...."). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972).

■ Fourth Amendment protection has also been extended to the curtilage of the home. *See Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214, 225 (1984).[3] "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question

---

**3.** The United States Supreme Court has not expressed an opinion on "the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself." *Oliver*, 466 U.S. at 180 n. 11, 104 S.Ct. at 1742 n. 11, 80 L.Ed.2d at 225 n. 11.

should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326, 334 (1987). In *Dunn*, the Court established four, nonexclusive factors to consider in determining whether an area falls within the curtilage of a home: (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301, 107 S.Ct. at 1139, 94 L.Ed.2d at 334–35. "[T]he primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home." *Id.* at 301 n. 4, 107 S.Ct. at 1140 n. 4, 94 L.Ed.2d at 335 n. 4.

■ Applying these factors, we conclude that the defendant established a legitimate expectation of privacy in her garage. We ascertain from the record that the garage into which Legg retreated was attached to her residence and closed to public view with doors.[4] Thus, the garage was in very close proximity to the home and, being attached to the residence, was included within an enclosure—the walls—surrounding the home. The door to the garage was closed, indicating that Legg had taken steps to prevent passersby from seeing inside the structure. Although the record is silent as to the specific uses of the garage by Legg, we can infer from the officer's description of the structure as a garage that it was used as a typical garage is used: to store vehicles and other items incident to the use of the premises as a home.

Given these facts, we think the garage "is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301, 107 S.Ct. at 1140, 94 L.Ed.2d at 335. This conclusion is consistent with decisions from other states that have concluded that a garage is part of the curtilage entitled to the safeguards of the Fourth Amendment. *See Martin v. United States*, 183 F.2d 436, 439 (4th Cir.1950); *State v. Brochu*, 237 A.2d 418, 423 (Me. 1967); *State v. Crea*, 305 Minn. 342, 344, 233 N.W.2d 736, 739 (1975); *State v. Winkler*, 552 N.W.2d 347, 352 (N.D.1996). We turn now to a determination of whether the State unreasonably invaded Legg's legitimate expectation of privacy.

IV. *Reasonableness of Warrantless Entry.*

■ The "central requirement" of the Fourth Amendment is reasonableness. *Illinois v. McArthur*, 531 U.S. 326, 329, 121 S.Ct. 946, 949, 148 L.Ed.2d 838, 847 (2001). In *McArthur*, the Court observed that in the past it had established "rules and presumptions designed to control conduct of law enforcement officers that may significantly intrude upon privacy interests." *Id.* at 329, 121 S.Ct. at 949, 148 L.Ed.2d at 847. Nonetheless, it refused to adopt a

---

**4.** Record evidence is scant with respect to the relationship of the garage to Legg's residence. The lack of abundant evidence on this aspect of the case may be due to the fact that the State did not challenge Legg's legitimate expectation of privacy in her garage in the district court. Overlooking this possible error-preservation problem, however, we think the officer's report supports a finding that the garage was attached to the residence. Kill-pack repeatedly referred to the door through which Legg entered the garage as the "door of her *residence*." (Emphasis added.) He also made the statement that he talked with her "after [he] got her out of the *house*." (Emphasis added.) The record is equally clear that Legg had only made it into her garage and not into the house proper when officer Killpack caught up with her.

per se rule of unreasonableness in the case before it. *Id.* at 331, 121 S.Ct. at 950, 148 L.Ed.2d at 847. Rather, to ascertain whether the seizure at issue in *McArthur* violated the Fourth Amendment, the Court "balance[d] the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Id.* at 331, 121 S.Ct. at 950, 148 L.Ed.2d at 848; *accord Breuer*, 577 N.W.2d at 47 (holding that to determine lawfulness of police conduct, court must balance "the intrusion on [the defendant's] Fourth Amendment interests against promotion of legitimate governmental interests").

It is helpful to our analysis of the present case to spend some time reviewing the balancing analysis the Court employed in *McArthur*. In that case, the police had accompanied the defendant's wife to the trailer she shared with the defendant to "keep the peace" while she removed her belongings. *McArthur*, 531 U.S. at 328, 121 S.Ct. at 948, 148 L.Ed.2d at 846. When she exited the trailer, she informed the police that the defendant "had dope in there." *Id.* at 329, 121 S.Ct. at 949, 148 L.Ed.2d at 846. The defendant denied an officer's request to search the trailer. *Id.* One of the officers then left to obtain a warrant. *Id.* The remaining officer told the defendant he could not . reenter the trailer unless the officer accompanied him. *Id.* The defendant subsequently went into the trailer a few times and each time the officer stood just inside the door to observe the defendant's actions. *Id.* When the other officer returned with the warrant, the police searched the trailer and discovered drug paraphernalia and marijuana. *Id.* In the defendant's later trial on criminal charges, the trial court suppressed the evidence found in the defendant's trailer, holding that his Fourth Amendment rights were violated. *Id.*

The United States Supreme Court reversed, concluding that the restrictions imposed on the defendant were reasonable. *Id.* at 328, 121 S.Ct. at 948, 148 L.Ed.2d at 846. The Court reached this conclusion by balancing "the privacy-related and law enforcement-related concerns." *Id.* at 331, 121 S.Ct. at 950, 148 L.Ed.2d at 848. First, the Court relied on the fact that the police had probable cause to believe that evidence of a crime could be found in the defendant's trailer. *Id.* Second, the Court noted that the police could have reasonably concluded that the defendant, "suspecting an imminent search, would, if given the chance, get rid of the drugs fast." *Id.* Third, the Court found it significant that "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy" by neither searching the trailer nor arresting the defendant until the warrant arrived. *Id.* Finally, the Court considered the restraint, which lasted two hours, to be "for a limited period of time." *Id.* at 332, 121 S.Ct. at 951, 148 L.Ed.2d at 848.

The Court distinguished the case of *Welsh v. Wisconsin,* the primary authority upon which Legg relies. *Id.* at 333, 334, 121 S.Ct. at 952–53, 148 L.Ed.2d at 849–51 (citing *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)). In *Welsh,* a witness had observed the petitioner driving erratically and then go off the road, winding up in an open field. 466 U.S. at 742, 104 S.Ct. at 2093, 80 L.Ed.2d at 738. The petitioner walked away from the scene of the accident. *Id.* at 742, 104 S.Ct. at 2094, 80 L.Ed.2d at 738. The witness told a police officer who subsequently arrived to investigate that the driver was either seriously ill or intoxicated. *Id.* at 743, 104 S.Ct. at 2094, 80 L.Ed.2d at 738–39. The officer then proceeded to the petitioner's residence a short distance away. *Id.* When the petitioner's daughter opened the front door, the officer

entered the petitioner's home and arrested the petitioner in his bedroom. *Id.* at 743, 104 S.Ct. at 2094, 80 L.Ed.2d at 739. The Supreme Court held that the officer's warrantless entry was unreasonable, even though evidence of the petitioner's intoxication might be lost if the arrest were not made immediately. *Id.* at 753–54, 104 S.Ct. at 2099–100, 80 L.Ed.2d at 745–46.

The Court began its analysis in *Welsh* with the premise "that warrantless felony arrests in the home are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances." *Id.* at 749, 104 S.Ct. at 2097, 80 L.Ed.2d at 743. Moreover, it pointed out that the Court had "recognized only a few such emergency conditions," citing to cases involving the "hot pursuit of a fleeing felon" and the "destruction of evidence." *Id.* at 750, 104 S.Ct. at 2097–98, 80 L.Ed.2d at 743 (citing *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300, 305 (1976); *Schmerber,* 384 U.S. at 770–71, 86 S.Ct. at 1835–36, 16 L.Ed.2d at 919–20). Rejecting any claim of exigent circumstances on the basis of potential destruction of evidence, the Court noted that the underlying offense for which there was probable cause to arrest the petitioner was "relatively minor." *Id.* at 750, 104 S.Ct. at 2098, 80 L.Ed.2d at 743. The Court observed that "[t]he State of Wisconsin ha[d] chosen to classify the first offense for driving while intoxicated as a *noncriminal,* civil forfeiture offense for which no imprisonment [was] possible." *Id.* at 754, 104 S.Ct. at 2100, 80 L.Ed.2d at 746 (emphasis added). In view of this classification of the offense, the court held that the warrantless arrest of the petitioner in his home could not "be upheld simply because evidence of the petitioner's blood-alcohol level might have dissipated while the police obtained a warrant." *Id.* The Court also rejected the State's claim that the arrest was justified on the basis of the hot pursuit doctrine or a threat to public safety:

> On the facts of this case, ... the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime. Moreover, because the petitioner had already arrived home, and had abandoned his car at the scene of the accident, there was little remaining threat to the public safety.

*Id.* at 753, 104 S.Ct. at 2099, 80 L.Ed.2d at 745.

As we noted earlier, the Court in *McArthur* distinguished *Welsh,* noting that the crimes at issue in *McArthur* were "jailable," "class C misdemeanors," whereas the driving-while-intoxicated offense in *Welsh* was a "nonjailable traffic offense." *McArthur,* 531 U.S. at 335–37, 121 S.Ct. at 952, 953, 148 L.Ed.2d at 850–51. In addition, the Court noted that the restriction at issue in *McArthur*—"[t]emporarily keeping a person from entering his home"— was "considerably less intrusive than police entry into the home itself in order to make a warrantless arrest or conduct a search," as occurred in *Welsh. Id.* at 336, 121 S.Ct. at 953, 148 L.Ed.2d at 851.

Before we attempt to apply the rules and analytical processes of *McArthur* and *Welsh* to the case before us, we briefly review the facts of a case upon which the State relies: *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In *Santana,* a police officer made a controlled drug buy with marked bills from an individual—McCafferty—who had obtained the drugs at Santana's residence while the officer waited in a car outside. 427 U.S. at 39–40, 96 S.Ct. at 2408, 49 L.Ed.2d at 303. After the officer and McCafferty drove away from Santana's home, the officer placed McCafferty under arrest. *Id.* at 40, 96 S.Ct. at 2408, 49

L.Ed.2d at 304. In response to questioning, McCafferty told the officer that Santana had the money. *Id.* The officer relayed this information to other officers who then drove to Santana's home. *Id.* When the police arrived at Santana's residence, they saw her standing in the doorway of her house. *Id.* The police got out of their car, shouting "police" and showing their identification. *Id.* As they approached the house, Santana entered the vestibule of her residence. *Id.* The officers followed her through the open door, catching her in the vestibule. *Id.* A search of Santana's person by police revealed some of the marked money and drugs. *Id.* at 40–41, 96 S.Ct. at 2408–09, 49 L.Ed.2d at 304.

In determining whether the police conduct in entering Santana's house infringed her constitutional rights, the Supreme Court began with the proposition that "the warrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment." *Id.* at 42, 96 S.Ct. at 2409, 49 L.Ed.2d at 305. The Court then considered "whether [Santana's] act of retreating into her house could thwart an otherwise proper arrest." *Id.* The Court held that it could not because the police were in hot pursuit. *Id.* In addition, the Court noted the intrusion was relatively minor and that "[o]nce Santana saw the police, there was likewise a realistic expectation that any delay would result in a destruction of evidence." *Id.* at 43, 96 S.Ct. at 2410, 49 L.Ed.2d at 305.

 As might be expected, the State claims that *Santana* is dispositive here and requires affirmance of the trial court's suppression ruling, whereas Legg

asserts that *Welsh* sets forth the governing rule of law and requires reversal of the court's ruling. We reject both arguments. There are distinguishing circumstances between the present case and the *Santana* and *Welsh* decisions that require our court to undertake an independent analysis here. We think these cases merely provide helpful guidance as we weigh the competing privacy and law enforcement concerns to determine whether the warrantless entry at issue in this case violated the Fourth Amendment.[5] To set the stage for our analysis, we quote from one of our own cases that expressed the framework for the balancing process we are about to undertake:

> whether the thing done [by government officials], in the sum of its form, scope, nature, incidents and effect, impresses as being fundamentally unfair or unreasonable in the specific situation when the immediate end sought is considered against the private right affected.

*State v. Hilleshiem*, 291 N.W.2d 314, 316 (Iowa 1980).

 Turning to the particular circumstances of the case before us, we first note that when officer Killpack entered Legg's garage, he had probable cause to arrest her for the crime of interference with official acts. *See generally State v. Harris*, 490 N.W.2d 561, 563 (Iowa 1992) (holding that probable cause requires "reasonable ground[s] for belief" that the person to be arrested has committed a crime); *see also State v. Horton*, 625 N.W.2d 362, 365 (Iowa 2001) ("[I]t is clear probable cause need not rise to the level of proof

5. Legg also cites our decision in *State v. Johnson*, 232 N.W.2d 477 (Iowa 1975), as setting forth a definitive test for the existence of exigent circumstances adequate to justify the warrantless entry into a house to make an arrest. This case is simply not on point because it does not involve a hot pursuit, as

does the matter before us. Moreover, as we made clear in *Johnson*, "[t]he standards by which a search and seizure are to be measured cannot be couched in fixed and inflexible terms. Each case must be decided on its own facts and circumstances." *Johnson*, 232 N.W.2d at 479.

required for conviction, or even indictment...."). This offense is committed when a person "knowingly resists or obstructs anyone known by the person to be a peace officer ... in the performance of any act which is within the scope of the lawful duty or authority of that officer." Iowa Code § 719.1. Legg's conduct in speeding up her car, running a stop sign, driving to her home, and retreating into her garage, *after* officer Killpack had started to pursue her with his lights activated, gave Killpack reasonable grounds to believe that Legg was knowingly obstructing Killpack's lawful performance of his duty to issue her a ticket for her initial traffic offense. *See State v. Baumann*, 616 N.W.2d 771, 774–75 (Minn.Ct.App. 2000) (finding probable cause for obstruction of legal process where defendant failed to stop after exiting his vehicle and closed the garage door on the officer despite the officer's activation of his squad car's overhead lights); *Winter v. State*, 902 S.W.2d 571, 573 (Tex.Ct.App.1995) (finding probable cause to arrest for evading arrest where officer activated his emergency lights and air horn, but defendant did not stop, drove to his home and pulled into his garage). Thus, at the time of Killpack's warrantless entry into Legg's garage, he had probable cause to arrest her for this crime. Significantly, the offense of interference with official acts is a serious misdemeanor, punishable by imprisonment up to one year and a fine of at least $250. *See* Iowa Code §§ 719.1, 903.1(1)(*b*).

Another important circumstance in this case is the fact that officer Killpack was in hot pursuit of the defendant when she retreated to her garage. *See Santana*, 427 U.S. at 42–43, 96 S.Ct. at 2410, 49 L.Ed.2d at 305 (holding that " 'hot pursuit' means some sort of a chase, but it need not be an extended hue and cry 'in and about [the] public streets' "). Society has an interest in not rewarding the evasion of lawful police authority by allowing suspects who make it to their homes steps ahead of law enforcement officers to claim sanctuary. *See Gasset v. State*, 490 So.2d 97, 98–99 (Fla.Dist.Ct.App.1986) ("The enforcement of our criminal laws, including serious traffic violations, is not a game where law enforcement officers are 'it' and one is 'safe' if one reaches 'home' before being tagged."). If such evasion were permitted, every attempt by police to stop a vehicle could potentially result in a race to the driver's home. *See State v. Paul*, 548 N.W.2d 260, 267 (Minn.1996) (rejecting argument that police may enter a defendant's home only when in hot pursuit of a felon, noting such a rule "would encourage drunk drivers to elude the police by racing through the streets to the sanctuary of their homes in order to 'freeze' a hot pursuit or to otherwise evade a lawful arrest").

The fact that the police were in hot pursuit of Legg is important for an additional reason. An officer in Killpack's position could reasonably suspect that Legg was driving while intoxicated based on her actions in running two stops signs and weaving from one side of the road to the other. Here, the officer's pursuit of Legg put her on notice that the police were, at the least, suspicious of her conduct. Thus, there was a real possibility that any delay to obtain a warrant would result in the destruction of evidence. If Legg's arrest had been delayed, she would have had the opportunity to drink alcohol in her home, thereby obscuring the source of the alcohol in her system and making difficult, if not impossible, any determination, from a subsequent blood-alcohol test, of the amount of alcohol in her system when she was driving. *See id.* Even if Legg would not have purposely tried to destroy evidence of her blood-alcohol level, this evidence would have naturally dissipated during any delay.

Another important circumstance in this case is the nature of the intrusion. Killpack entered Legg's garage, not her house proper as in *Santana* or her bedroom as in *Welsh*. *See McArthur*, 531 U.S. at 336, 121 S.Ct. at 953, 148 L.Ed.2d at 851 (distinguishing the intrusion of police in *Welsh* into the defendant's bedroom from the "less serious" intrusion made in *McArthur* that consisted primarily of preventing the defendant from entering his home without the police). In addition, the magnitude of the infringement was rather slight. Killpack's entry into Legg's garage was no surprise to her; he was following closely on her heels when she entered the garage. In addition, he entered through an open door and took only three steps inside. Thus, the intrusion was peaceful and restricted to that which was necessary to allow the officer to speak with Legg.

When we examine the competing interests in this case, we conclude that the officer's conduct was reasonable. Although Legg certainly had a legitimate expectation of privacy in her garage, there were exigent circumstances and probable cause that justified Killpack's minimal invasion of this privacy interest. Killpack had probable cause to arrest Legg for a serious misdemeanor while she was in a public place. Unlike the civil infraction at issue in *Welsh*, the crime believed to be committed in the present case could possibly have resulted in a one-year jail term. *Cf. McArthur*, 531 U.S. at 335, 121 S.Ct. at 952, 148 L.Ed.2d at 850 (finding a "significant distinction" between the " 'nonjailable traffic offense' of driving while intoxicated" at issue in *Welsh* and the "jailable" misdemeanors at issue in *McArthur* ); *Dyer v. State*, 680 So.2d 612, 613 (Fla.Dist.Ct.App. 1996) (stating that misdemeanor possession of marijuana, punishable by up to a year in jail, was "a much more serious offense than in *Welsh*"); *Paul*, 548 N.W.2d at 267 (distinguishing *Welsh* on

the basis that the offense involved in *Paul* was a misdemeanor for which imprisonment was possible); *Stark v. N.Y. State Dep't of Motor Vehicles*, 104 A.D.2d 194, 483 N.Y.S.2d 824, 826 (1984) (finding *Welsh* "readily distinguishable" in part because New York classified OWI as a misdemeanor punishable by up to one year in jail); *Winter*, 902 S.W.2d at 574 (holding that *Welsh* was distinguishable because the officer in *Winter* had probable cause to arrest for evading arrest, a "jailable" offense). In addition, there were exigent circumstances here. The police officer had witnessed the commission of a crime and was in hot pursuit when Legg retreated to her garage. Thus, the concerns present in *Santana* are present here: (1) the "realistic expectation ... that any delay would result in destruction of evidence"; and (2) the undesirable consequences of allowing a person to thwart an otherwise proper arrest "by the expedient of escaping to a private place." *Santana*, 427 U.S. at 43, 96 S.Ct. at 2410, 49 L.Ed.2d at 305–06. Finally, the intrusion that occurred in this case was relatively minimal. *See Gasset*, 490 So.2d at 99 (characterizing officers' warrantless entry into the defendant's garage as a "de minimis intrusion"); *cf. Breuer*, 577 N.W.2d at 49 (characterizing State's conduct in opening exterior door, entering hallway, and walking up stairs to defendant's apartment door as a "minimal intrusion," despite defendant's legitimate expectation of privacy in these areas).

In summary, when "the immediate end sought is considered against the private right affected," Killpack's conduct does not impress us "as being fundamentally unfair or unreasonable." *Hilleshiem*, 291 N.W.2d at 316. Therefore, we hold Legg's Fourth Amendment rights were not violated. *See Gasset*, 490 So.2d at 98–99 (holding that warrantless entry into the defendant's garage was constitutional because

officers were in hot pursuit of the defendant and had probable cause to arrest the defendant for two misdemeanors, one punishable by up to ninety days in jail and the other punishable by up to one year in jail); *Baumann,* 616 N.W.2d at 775 (finding no Fourth Amendment violation based on officer's warrantless entry into defendant's garage, where officer had probable cause to arrest defendant for obstruction of legal process and was in hot pursuit); *State v. Penas,* 200 Neb. 387, 389, 263 N.W.2d 835, 837 (1978) (finding no Fourth Amendment violation where officer, who was in hot pursuit, had probable cause to arrest for OWI and eluding); *Stark,* 483 N.Y.S.2d at 826 (upholding warrantless entry into defendant's bedroom, where defendant had retreated after police pursuit, noting that police had probable cause to arrest defendant for misdemeanor OWI); *Winter,* 902 S.W.2d at 574–75 (holding officer in hot pursuit of driver he suspected of OWI could enter the defendant's garage without a warrant where there was probable cause to arrest for evading arrest); *cf. Breuer,* 577 N.W.2d at 49 (holding that officer's warrantless entry into area of apartment house in which defendant had legitimate expectation of privacy was reasonable in view of officer's need to investigate complaint of reckless driving). Accordingly, the trial court did not err in denying Legg's motion to suppress. We therefore affirm her conviction.

**AFFIRMED.**

All Justices concur except LARSON, J., who takes no part.

SNELL, S.J.,* participates in lieu of STREIT, J., who takes no part.

* Senior Judge assigned by order pursuant to