# IN THE SUPREME COURT OF IOWA

No. 07–0045

Filed March 6, 2009

**STATE OF IOWA,**

      Appellant,

vs.

**REMIE PHIL HARRIS,**

      Appellee.

---

Appeal from the Iowa District Court for Polk County, William A. Price, Judge.

State seeks interlocutory review of district court's suppression of blood test results on ground State had failed to establish the foundational requirement set forth in Iowa Code section 321J.10A(1)(*c*). **AFFIRMED.**

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, John P. Sarcone, County Attorney, and Jess W. Vilsack, Assistant County Attorney, for appellant.

Matthew Lindholm of Gourley Rehkemper & Lindholm, PLC, Des Moines, for appellee.

**PER CURIAM.**

In this interlocutory appeal, the State seeks review of a district court ruling suppressing the results of a blood test drawn from the defendant, Remie Harris, without a search warrant. The blood test was administered following a single-vehicle accident wherein the defendant struck and killed a pedestrian. The trial court suppressed the blood sample and test result on the ground the State had failed to establish "the peace officer reasonably believe[d] the officer [was] confronted with an emergency situation in which the delay necessary to obtain a warrant under section 321J.10 threaten[ed] the destruction of the evidence." *See* Iowa Code § 321J.10A(1)(*c*) (2005). We now affirm.

### I. Facts and Prior Proceedings.

At the suppression hearing conducted on November 14, 2006, the following undisputed facts were elicited. On April 17, 2006, at 7:12 p.m., Iowa State Patrol Officer David Overton was dispatched to Interstate 80, just east of Merle Hay Road, to a location where a pedestrian had been struck by a vehicle. Overton arrived at the scene within minutes. Upon his arrival, he observed medical personnel attending to an elderly female victim. Overton, therefore, turned his attention to closing the interstate and securing the scene.

Once further assistance arrived, Overton began to gather information from which he determined Harris was the driver of the vehicle that had struck the victim. As he approached the defendant, Overton detected a strong odor of alcohol on the defendant's breath. He also observed Harris's eyes were bloodshot and watery, and his speech was slurred. Harris declined Overton's request to perform field sobriety tests. Harris did, however, agree to take a preliminary breath test (PBT). The PBT was administered at 7:38 p.m. and the result was .125 percent.

Harris was then examined by medical personnel. After Harris declined further treatment, Overton placed him under arrest. The defendant was transported to the state patrol post where, upon arrival, he was allowed to make several phone calls. Harris called his wife and also made attempts to contact an attorney. During this time, Harris was informed by Overton of the implied-consent law. Overton also notified the on-call assistant county attorney, Jim Ward, who advised the officer to begin preparing a search warrant application for obtaining a blood sample from the defendant.

Overton did not begin working on the search warrant application immediately, but waited until Ward's arrival at approximately 8:40 p.m. At 8:54 p.m., Overton invoked implied consent. The defendant refused to give his consent. After further consultation with Ward, the officer decided to obtain a warrantless blood specimen from the defendant while continuing to work on the warrant application. The blood specimen was drawn by a technician from the medical examiner's office at 9:06 p.m. A warrant was obtained between 10 and 10:30 p.m.

## II. Discussion.

**A. Scope of Review.** The district court based its decision to suppress the blood sample on its interpretation of Iowa Code section 321J.10A. When suppression rulings are based upon statutory interpretation, the case is reviewed for correction of errors of law. *State v. Demaray*, 704 N.W.2d 60, 62 (Iowa 2005). When the language of a criminal statute is clear, the court looks no further for meaning than its express terms. *State v. Jorgensen*, 758 N.W.2d 830, 835 (Iowa 2008).

**B. Statutory Framework.** When a traffic accident has resulted in death or in injury reasonably likely to cause death and there are reasonable grounds to believe at least one of the drivers at fault for the accident was intoxicated, Iowa Code section 321J.10 allows for the withdrawal of a

specimen of blood for chemical testing over the individual's objection, pursuant to a search warrant. Iowa Code § 321J.10. Withdrawal of blood without a warrant is, however, permitted in certain circumstances. *Id.* § 321J.10A(1). Iowa Code section 321J.10A(1) provides:

> Notwithstanding section 321J.10 [requiring a warrant to obtain a blood sample in the absence of consent], if a person is under arrest for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in violation of section 321J.2 or 321J.2A, and that arrest results from an accident that causes a death or personal injury reasonably likely to cause death, a chemical test of blood may be administered without the consent of the person arrested to determine the amount of alcohol or a controlled substance in that person's blood if all of the following circumstances exist:
>
>     *a.* The peace officer reasonably believes the blood drawn will produce evidence of intoxication.
>
>     *b.* The method used to take the blood sample is reasonable and performed in a reasonable manner by medical personnel under section 321J.11.
>
>     *c.* The peace officer reasonably believes the officer is confronted with an emergency situation in which the delay necessary to obtain a warrant under section 321J.10 threatens the destruction of the evidence.

*Id.* § 321J.10A(1).

**C. Arguments of the Parties.** The State asserts the officer, consistent with Iowa Code section 321J.10A, reasonably believed he was faced with an emergency situation in which the time required to obtain a warrant threatened the destruction of evidence. The State also contends that, even if the officer could have obtained a warrant by telephone, he was not required to do so once he reasonably determined an exigency existed. Moreover, the State argues the exigency was not eliminated by the possibility extrapolation could be used to estimate the defendant's blood alcohol level at the time of the accident. Such extrapolations, the State asserts, are affected by numerous variables and are, therefore, speculative. *See People v. Thompson,* 135 P.3d 3, 12 (Cal. 2006).

The defendant argues the district court did not err in suppressing the warrantless blood test because Overton did not personally recognize an emergency situation and because no emergency situation actually existed. Additionally, the defendant contends that if an emergency situation existed, it was created by the officer and assistant county attorney, and the State cannot rely on these circumstances to forego the warrant requirement.[1]

**D. Prior Precedent.** We recently addressed the application of Iowa Code section 321J.10A(1) in light of the Fourth Amendment protections against unwarranted intrusions into personal privacy and dignity in *State v. Johnson*, 744 N.W.2d 340 (Iowa 2008). In *Johnson*, the court was faced with the same question it must address here: "[W]hether the peace officer reasonably believed he was confronted with an emergency situation in which the delay necessary to obtain a warrant threatened the destruction of evidence." 744 N.W.2d at 342.

In *Johnson*, we noted Iowa case law follows the rationale set forth in *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), "that the natural dissipation of alcohol from the bloodstream *may* be an exigent circumstance making it constitutionally permissible to obtain a blood sample without a search warrant." *Id.* at 343 (emphasis added) (citing *State v. Legg*, 633 N.W.2d 763, 772 (Iowa 2001); *State v. Findlay*, 259 Iowa 733, 743, 145 N.W.2d 650, 656 (1966)). We agreed, however, with those courts that found *Schmerber* required more than the mere phenomenon of alcohol dissipation. *Id.* at 344 (citing *State v. Rodriquez*, 156 P.3d 771, 776 (Utah 2007) ("*Schmerber* does not stand for the proposition that the loss of evidence of a person's blood-alcohol level through the dissipation of alcohol

---

[1]Although the defendant notes that seizure of the defendant's blood was made at the state trooper post, as opposed to a hospital setting or other medical environment, he does not seriously attack the district court's conclusion that "the requirements of Sections 321J.10A(1)(*a*) and (*b*) are met." Therefore, we give this issue no further consideration.

from the body [alone] was a sufficient exigency to justify a warrantless blood draw.")). *Schmerber* required additional circumstances, such as time-based considerations, to support a warrantless intrusion under the Fourth Amendment. *Schmerber,* 384 U.S. at 770, 86 S. Ct. at 1835–36, 16 L. Ed. 2d at 920 ("Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was not time to seek out a magistrate and secure a warrant. *Given these special facts*, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." (Emphasis added.)).

In *Johnson*, those additional circumstances/time-based considerations were satisfied by the facts of the case. When officers arrived at the scene of the accident, time had to be taken by the police officers to attend to the victim, interview witnesses, and locate the defendant. *Johnson*, 744 N.W.2d at 344. Once the defendant was located, additional time was expended in transporting him to the traffic office and eventually to the hospital where the blood sample was drawn without a warrant. *Id.* In finding the officer's actions complied with section 321J.10A and the Fourth Amendment, we stated:

> In all, more than two and a half hours passed between the time of the accident and the time Johnson's blood was drawn. During this time, his blood-alcohol concentration was continually diminishing due to the natural dissipation of alcohol. The traffic officer testified that he believed evidence of Johnson's blood-alcohol concentration would be destroyed if he waited to draw blood until after a search warrant was obtained. We conclude that the officers complied with section 321J.10A, which requires only a reasonable belief that the delay necessary to obtain a warrant would threaten the destruction of the evidence.

*Id.* at 344–45.

**E. Application to Facts.** Section 321J.10A(1)(*c*) requires the peace officer reasonably believes he is confronted with an emergency situation in which the delay necessary to obtain a warrant threatens the destruction of the evidence. Section 321J.1(8) defines "peace officer" to include a member of the highway patrol, but this definition does not include the county attorney or his assistants. *See* Iowa Code § 321J.1(8). The defendant contends the evidence, including Overton's testimony, establishes that the officer was not acting in response to an emergency situation with which he believed he was confronted, but was acting on instructions from the assistant county attorney. Therefore, the defendant claims, the requirement of Iowa Code section 321J.10A(1)(*c*) was not met. *See Johnson*, 744 N.W.2d at 344 (finding "traffic officer['s] testi[mony] that he believed evidence of [defendant's] blood-alcohol concentration would be destroyed if he waited to draw blood until after a search warrant was obtained" supported compliance with section 321J.10A).

In reviewing the facts, we note that nearly two hours had passed between the time of the fatal accident and the time of the blood draw. During this time, Overton was engaged in assisting with the closing of the interstate, interviewing witnesses, and determining the identity of the driver of the vehicle. Once an identification was made, further time was expended transporting Harris to the post. Although instructed by the assistant county attorney to begin the warrant application, Overton chose to wait until Ward arrived because he was unfamiliar with the process and needed assistance with the preparation. In the meantime, the defendant was provided an opportunity to contact his family and to attempt to locate an attorney. It was not until 8:54 p.m., when the defendant affirmatively refused to consent to providing a blood specimen, that the decision was made to go ahead with the warrantless blood draw. Overton testified that, after the defendant

refused to give a breath sample, the assistant county attorney advised him to go ahead and get a blood sample.

While factual similarities exist between this case and *Johnson*, there is one important distinguishing fact. In *Johnson*, the officer testified he believed evidence of the blood-alcohol concentration would be destroyed if he waited to draw blood until after a search warrant was obtained. *Johnson*, 744 N.W.2d at 344. Here, Overton repeatedly testified his reason for ordering the blood draw was that he was following the instructions of the assistant county attorney, not any specific concern or knowledge on his part that the time it would take to obtain a warrant would result in the destruction of evidence.[2]

---

[2]At the hearing, the following exchanges took place between counsel for the State and Officer Overton:

> Q: After the refusal was a decision made to take a blood sample from the defendant? A: Jim Ward had told us to go ahead and get a sample from the defendant, yes.
>
> Q: So you made that decision after consulting with the county attorney, who was Jim Ward in this case? A: Yes.
>
> . . . .
>
> Q: . . . Did you know how long it would take to actually get a warrant in this case? A: No, I did not.
>
> . . . .
>
> Q: When the decision was made—or prior to the decision being made to take the blood sample, were you having a discussion with the county attorney about the rationale for taking the blood sample? A: He wanted to get—Jim Ward wanted to get the blood sample within the two-hour time frame.

Subsequently, the following exchange took place between defense counsel and the officer:

> Q: Do you know what the significance is of that two-hour window? A: Well, I know that Jim wanted the blood withdrawn within that two hours. And as time goes on, alcohol's going to metabolize in the system.
>
> . . . .
>
> Q: So the two hours runs from the administration of the PBT or the arrest, whichever occurs first? A: That'd be correct.

When the officer was questioned about obtaining a telephonic warrant, the following exchange took place:

While Overton was aware that blood-alcohol levels dissipate over time and that this natural dissipation will result in the destruction of evidence, this knowledge alone is not sufficient to satisfy the statute. *See State v. Lovig,* 675 N.W.2d 557, 566 (Iowa 2004) (in considering whether exigent circumstances existed to justify a warrantless search, the court noted the actual time to obtain a warrant is an important fact, and if the time is relatively short, fear over dissipation will be alleviated). The statute requires that the peace officer, not the county attorney, reasonably believe that the delay involved in obtaining a search warrant would result in the destruction of evidence. *Cf. State v. Palmer,* 554 N.W.2d 859, 865–66 (Iowa 1996) (holding statutory conditions required for implied consent included that

---

Q: . . . [A]re you familiar with being able to obtain a search warrant not in written form, but by an oral request to a judge? A: This was how Mr. Ward wanted to do it, so that's how I went about it, was how Mr. Ward wanted to do this. . . . A: I don't work with search warrants enough. I was asking Jim Ward if we can do it by phone, and I believe he said no, and we were doing it, and this is the way we were going to do it.

When defense counsel inquired as to what was the specific emergency, the following exchanges took place:

Q: Do you happen to know as you sit here today why you didn't fulfill that written request and actually present that warrant to the judge prior to the withdrawal of blood from my client? A: Mr. Ward told me that we could go ahead and get the blood from the defendant, and then later we had the search warrant signed.

. . . .

Q: . . . [C]ould you tell the Court what the emergency situation was in this case that caused you to draw blood . . . without a warrant . . . . A: Well, I was following the guidelines from Jim Ward. And then the other thing was, like I said, we didn't know as far as—we could have been looking at a vehicular homicide or something like that, so that's why we wanted to get the blood as soon as we could, because like I said, evidence does dissipate over time. . . .

. . . .

Q: Was the emergency situation that Jim Ward says take the blood? A: This is what the county attorney—we had all what we thought we may have, what we might have, and this was the decision of the county attorney.

Q: And you followed his instructions? A: And I followed his instructions.

section's definition of "peace officer"). Overton acknowledged he was unaware of the time it would take to obtain a warrant due to his lack of familiarity with the process. More importantly, however, he never asserted the reason he ordered the warrantless blood sample was his belief that the time it would take to obtain the warrant would result in the destruction of evidence. The entire gist of his testimony was that he was acting on the instructions of the assistant county attorney. The undisputed impetus for his ordering the warrantless blood draw was the instruction from the assistant county attorney. For this reason, the district court correctly determined the requirement of Iowa Code section 321J.10A(1)(*c*) was not met. The order suppressing the test results must be affirmed.

**AFFIRMED.**

All justices concur except Wiggins and Baker, JJ., who take no part.

This opinion shall be published.