# IN THE COURT OF APPEALS OF IOWA

No. 19-0862
Filed November 4, 2020

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**NICHOLAS ASHLEY BOGGS,**
     Defendant-Appellant.
_____

Appeal from the Iowa District Court for Warren County, Richard B. Clogg (suppression motion) and Paul R. Huscher (bench trial & sentencing), Judges.

Nicholas Boggs appeals four drug-related convictions. **REVERSED AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Thomas E. Bakke, Assistant Attorney General, for appellee.

Heard by Doyle, P.J., and Tabor and Ahlers, JJ.

**DOYLE, Presiding Judge.**

Nicholas Boggs appeals his convictions and sentences on four offenses related to the seizure of illegal drugs from his apartment following a January 2019 search. He challenges the denial of his motion to suppress evidence he claims was obtained in violation of his constitutional right to be free from unreasonable searches.

**I. Background Facts and Proceedings.**

On the night of January 17, 2019, Carlisle police officers were investigating a report of a low-flying drone that almost hit a pedestrian. The drone was reportedly operated by someone named Jason. While investigating the area, the officers encountered Boggs outside the apartment he shares with his then seventeen-year-old son. Boggs told the officers he had seen a drone but did not know who was flying it, nor did he know anyone named Jason. When asked if someone named Jason might be inside the apartment, Boggs stated he had just returned home and did not know. Sergeant Dave Larson asked Boggs if he minded if they went up to check to see if someone named Jason was inside. Boggs replied, "I can go check" and headed to his apartment.

The apartment is situated on the second floor at the rear of a building. The first floor houses a business. To reach the apartment, one must take an exterior stairway that runs along the outside of the building. At the top of the stairs is a small landing. Off the landing is a white storm door that opens to an enclosed porch. At the other end of the porch is a solid wooden door to the interior of the apartment. One must go through the porch to reach the front door of the

apartment. Neither the storm door nor the interior door is equipped with a doorbell or doorknocker.

The officers followed Boggs. By the time Officer Andreas Guerra reached the bottom of the stairs, Boggs was almost to the top. Boggs answered one of the officer's questions about the apartment's address as he hurried up the stairs. Boggs entered the porch through the storm door and went towards the front door of the apartment. The storm door did not close behind Boggs. When Officer Guerra reached the door at the top of the stairs, Boggs was just entering his apartment. Officer Guerra barged into the porch through the open storm door without stopping and asking for permission to enter. He rushed through the porch as Boggs pushed the apartment's front door to shut it. Just as the door was about to close, Officer Guerra reached his hand out and pushed the door open. Again, without stopping and asking permission to enter, he just walked right into the apartment. He met Boggs in the front hallway. Shortly thereafter, Sergeant Larson arrived and stood in the front doorway of the apartment. After some small talk, Sergeant Larson asked, "Any reason I'm smelling marijuana?" Boggs responded, "I don't have any clue." Boggs's son then entered the apartment. Again, after a little small talk, Sergeant Larson asked Boggs's son, "Any reason why we're smelling marijuana in here?" The son responded, "No." Boggs denied the officers permission to search the apartment.

Law enforcement searched Boggs's apartment after obtaining a warrant. Inside, officers found drugs, paraphernalia, and a large sum of money. The State charged Boggs with twelve counts of drug-related offenses. Boggs moved to suppress the evidence obtained during the search of his apartment, which the trial

court denied. The State dismissed all but four charges, and the parties agreed to a bench trial on the minutes of evidence. The court found Boggs guilty of all four charges and sentenced him to consecutive sentences totaling fifty years in prison with a nine-year mandatory minimum sentence.

**II. Scope and Standard of Review.**

Boggs appeals the denial of his motion to suppress. He alleges the officers violated his constitutional rights by entering the enclosed porch without his consent. We review the denial of a motion to suppress based on deprivation of constitutional rights de novo. *See State v. Hunter*, 947 N.W.2d 657, 660 (Iowa 2020). We therefore review the entire record, the evidence introduced at both the suppression hearing and at trial, and "make an independent evaluation of the totality of the circumstances." *Id.* (citation omitted).

**III. Analysis.**

The federal and state constitutions prohibit the government from engaging in unreasonable searches. *See State v. Frescoln*, 911 N.W.2d 450, 453 (Iowa 2017). We presume a warrantless search is unreasonable unless it falls under a recognized exception to the warrant requirement. *See id.* The "chief evil" these constitutional provisions protect against is the government's physical entry into the home. *State v. Legg*, 633 N.W.2d 763, 767 (Iowa 2001) (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972)); *see also State v. Kern*, 831 N.W.2d 149, 164 (Iowa 2013) ("[T]he Fourth Amendment and article I, section 8 create a substantial expectation of privacy in the home.").

The constitutional protections against unreasonable searches extend to a home's curtilage. *Legg,* 633 N.W.2d at 767. Whether an area falls within a home's

curtilage is determined by an individual's reasonable expectation of privacy in that area. *See id.* at 767-68. The United States Supreme Court has established four nonexclusive factors to consider in making that determination:

> (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by."

*Id.* at 768 (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)). "[T]he primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home." *Dunn*, 480 U.S. at 301 n.4.

The enclosed porch meets the first two factors in the criteria for curtilage. It is attached to Boggs's apartment and sits above the building's first floor. It is covered by the building's roof and has permanent walls. The porch is outfitted with storm windows and an aluminum storm door with a window in the center. Functionally and structurally, the porch is the same as the rest of the building. *See State v. Reinier*, 628 N.W.2d 460, 462-63 (Iowa 2001) (noting "[t]he outside walls of the porch had the same siding as the remainder of the house and the roof of the porch also conformed to the roof of the remainder of the house" in determining its occupant had a reasonable expectation of privacy on it); *State v. Kriley*, 976 S.W.2d 16, 22–23 (Mo. Ct. App. 1998) (finding an enclosed structure was part of the home where, notwithstanding the lack of a door or floor, one exterior wall was made of concrete, brick, wood and glass, another exterior wall was shingled like the house, the roof and flashing were continuous between the house and the

structure, the room was wired for electricity, and it held numerous items and was being used for various purposes).

In its brief, the State does not contest the first two factors but claims "the remaining factors support the conclusion that Boggs did not have a legitimate expectation of privacy in the porch." But at oral argument, the State seemed to concede that Boggs did have a reasonable expectation of privacy in the porch. Nevertheless, we turn then to the third element of the test: the nature of the uses to which the porch is put. The district court found "[n]othing of value was stored in this area," but there is no dispute that Boggs kept a table and chairs on it along with a refrigerator or deep freezer. A cabinet with a countertop runs along one side of the porch. The presence of furniture and other items on the porch indicates its use for those intimate activities associated with domestic life and the privacies of the home. Although there may have been items of trash on the porch as well, that does not change the nature of the structure. *See Ingram v. State*, 703 P.2d 415, 426-27 (Alaska Ct. App. 1985), *aff'd*, 719 P.2d 265 (Alaska 1986) (finding a reasonable expectation of privacy in a shared storage shed that contained "primarily junk"); *In re Lallo*, No. 1997CA00426, 1998 WL 525561, at *3 (Ohio Ct. App. Aug. 17, 1998) ("Due to the nature of the structure, we find the expectation of privacy pertaining to the porch was reasonable. The porch was entirely enclosed, with windows and a door. It has double hung pane windows with screens. The porch is wired for electricity and has lamps and a telephone. The porch also contains in-door furniture. . . . *The fact that various items may be stored in this area, such as dog dishes, boxes and boat oars, does not alter the nature of the structure.* The porch is enclosed, attached to the house and has a front door.

Appellant clearly had an expectation of privacy as it pertains to the porch." (emphasis added) (internal citations omitted)). Boggs had an expectation of privacy on his porch.

On the final element, the district court found Boggs failed to establish a reasonable expectation of privacy interest in the porch because "[t]he condition of the storm door missing a window indicates it could not be locked." The evidence on this point is in dispute. One officer described the door to the porch as "the standard storm door, push button lock that was, you know, the normal flimsy handle on it" with "no external lock." He also claimed that even if the door could be locked, "you could reach through the open window and open the door from the inside." The upper half of the storm door held a glass panel, but it is not readily apparent from Officer Guerra's body camera video whether the bottom half lacked either a glass panel or a window screen panel on the night in question. Regardless, the Fourth Amendment protection against unreasonable intrusion into an area where privacy is expected "extends even to 'occupants of flimsily constructed dwellings with unobstructed windows or other openings directly on public lands, streets, or sidewalks, who failed to lock their doors to bar entrance.'" Wayne R. LaFave, 1 Search and Seizure § 2.3(b) (6th ed. Sept. 2020 update) (quoting *United States v. Moss*, 963 F.2d 673, 676 (4th Cir. 1992)); *see also United States v. Wilson*, No. 08-CR-2020-LRR, 2009 WL 905709, at *7 (N.D. Iowa Mar. 30, 2009) (observing that it is not uncommon for residents of small towns in Iowa to leave their doors unlocked). For the same reason, we discount the State's argument that Boggs's lack of window coverings diminishes his expectation of privacy. *See Wilson*, 2009 WL 905709, at *7 ("Glass front doors are not unknown

in Iowa, and the mere fact Defendant did not place a curtain on his glass door cannot carry the day for the government."). More important to note is that the porch and its contents cannot be observed by those simply passing by the building. *C.f. Ingram*, 703 P.2d at 426-27 (noting, in finding a reasonable expectation of privacy in a shared storage shed attached to the rear of a fourplex and enclosed by a porch and its stairs, that neither "the presence of a nearby walkway or the partially open door of the shed justif[ies] a warrantless police entry"); *State v. Witherington*, 702 So. 2d 263, 264-65 (Fla. Dist. Ct. App. 1997) (holding the warrantless search of a screened-in back porch violated the home owner's legitimate privacy expectation even though the yard was not fenced and the owner was visible through the screen because the porch was not visible without entering back yard and the deputy was on property only to investigate misdemeanor boating violation, did not plan to make arrest, and no other exception to the warrant requirement applied). Its location one-story above ground and at the back of the building protects the porch and its contents from view of all but those who intend to enter or to seek audience with the apartment's occupant. Applying the factors first articulated in *Dunn*, Boggs's porch is a constitutionally protected area.

The United States Supreme Court has held, "The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Florida v. Jardines*, 569 U.S. 1, 7 (2013) (citation omitted). In *Jardines*, the Court considered whether law enforcement violated a home owner's constitutional rights by bringing a drug-detecting dog onto the porch. *Id.* at 3-4. Because it found the investigation took place in a constitutionally protected area, the court next considered whether the investigation "was accomplished through an

unlicensed physical intrusion." *Id.* at 7. The existence of a license to enter onto property may be implied by local custom. *See id.*

> This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.

*Id.* at 8. A government actor has the same license as a private citizen. *See id.*

The State argues it was not unreasonable for the officers to walk onto the porch to reach the inner door to the apartment. The investigating officers provided different accounts on the question of whether they believed they had license to enter the porch. Officer Guerra testified he would not ordinarily have walked onto the porch without knocking on the storm door:

> Q. Officer Guerra, if you had not met Mr. Boggs down in the driveway working on the trailer when you were looking for the drone person and you had walked up those stairs, would have you knocked on that white door? A. Yes. If I was there by myself, not knowing who lived at that residence or who all lived at that residence, yes.[1]

Boggs's attorney followed up on this question on cross-examination:

> Q. So you would have knocked on that white door if you went to that house.
> That's what you just said, right? A. Yeah, possibly, yep, or any other residence in the vicinity.
> . . . .
> Q. [B]ecause that white door is part of the house, right? Inside that door was part of that apartment? A. To go through there, yes . . . .
> . . . .
> Q. . . . And there was things of value in that area right behind that white door? A. Correct.

---

[1] In response to the prosecutor's next question, Officer Guerra agreed that if he was "trying to get the attention of the people who lived inside the house," he "would have needed to go into the porch in order to knock on the big door."

On the other hand, Sergeant Larson had no qualms about walking onto the porch, testifying that he would not stop and knock on the storm door to speak with the apartment's occupants because the storm door is "far enough away way from that actual main entrance door that nobody would have heard." The sergeant likened the storm door to a screen door at the main entry of a house that one opens to knock on the main door. Of course, a screen door that hangs in front of a main door at a home's entry is not separated by any space of consequence. Here, there was an entire room in which Boggs enjoyed an expectation of privacy separating the storm door and the inner wooden door.

At least one court has rejected Sergeant Larson's reasoning:

> [T]he mere fact that it was "understandable" that the officers desired to proceed to the inner door to improve the chances of their knocking being heard did not constitutionally justify their entry. This is so in that, to justify a denial of Fourth Amendment protection simply because law enforcement believes its criminal investigation would be enhanced by particular investigative conduct, would, as a practical matter, completely abrogate the protection afforded by the amendment.

*Kriley*, 976 S.W.2d at 23.

But even assuming that the officers had a license to enter the porch in order to make contact with an occupant of the apartment, that license does not apply under the circumstances. The officers made contact with Boggs outside. Boggs was in Officer Guerra's presence when Officer Guerra entered the porch. It follows that the only legitimate way the officers could enter the porch was with Boggs's consent.

The State does argue that the officers had Boggs's consent to enter the porch. The State bears the burden of providing consent as an exception to the

warrant requirement. *See State v. Lewis*, 675 N.W.2d 516, 522 (Iowa 2004); *see also State v. Reinier*, 628 N.W.2d 460, 464 (Iowa 2001) (noting that warrantless searches are presumed to be unreasonable unless they fall within one of the established exceptions to the warrant requirement). A homeowner must give "free and voluntary" consent for the exception to apply. *Reinier*, 628 N.W.2d at 465. "Consent is considered to be voluntary when it is given without duress or coercion, either express or implied." *Id.* Factors to help determine the validity of the consent encompass "both the circumstances surrounding the consent given and the characteristics of the defendant." *Id.* The State must establish voluntary consent by a preponderance of the evidence. *See id.*

The interaction between the officers and Boggs captured on body camera video shows that Sergeant Larson asked, "Do you mind if we go up and see if there's somebody named Jason that lives here?" Boggs did not give his assent to the officers doing so. Instead, he cut the sergeant off by replying, "*I* can go check," words that indicate he alone planned to look around the apartment. (Emphasis added.) Boggs then turned and headed toward the apartment building. Rather than waiting for the officers to follow, he moved quickly and was at the top of the stairs by the time the officers reached the bottom. During his climb up the stairs, Boggs provided his address when asked but did not stop or slow his movement in doing so. And though the porch door did not close behind Boggs, he made no effort to keep it open for the officers. Boggs attempted to close the front door to the apartment but was thwarted when Officer Guerra pushed the door open before it could snap shut. Boggs's actions appear to be those of a person in a hurry rather than a host welcoming visitors into his home. A reasonable person could conclude

that Boggs was hurrying to keep the officers out of his apartment rather than inviting them in.  Although Boggs did not protest, that does not equate with consent.  *See State v. Ochoa*, 792 N.W.2d 260, 292 (Iowa 2010) (noting that the State's burden of showing consent was freely and voluntarily given "cannot be discharged by showing no more than acquiescence to a claim of lawful authority" (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968))).

Without Boggs's voluntary consent to allow the officers onto the enclosed porch, where he enjoyed a reasonable expectation of privacy, the officers intruded on his rights under the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution.  The trial court erred in denying his motion to suppress.  We vacate Boggs's convictions, reverse the suppression ruling, and remand the case for further proceedings.

**REVERSED AND REMANDED.**