361 S.E.2d 465

**Orin Bruce BENNETT**

v.

**Officer Dave COFFMAN, etc., et al.**

No. 17058.

Supreme Court of Appeals of West Virginia.

April 14, 1987.

Laverne Sweeney, Grafton, for appellant.

Robert J. Wallace, Coleman & Wallace, Buckhannon, James M. Wilson, Clarksburg, Alexander M. Ross, Buckhannon, for appellee.

NEELY, Justice:

At about 11:00 p.m. on 23 December 1982, Dave Coffman and Robert Campbell, on-duty police officers for the City of Buckhannon, went to the Ranch Bar in Buckhannon in response to a disturbance call from the proprietor. They were told by the proprietor that Orin Bruce Bennett had recently been at the bar in a state of extreme intoxication. When asked to leave the bar, Mr. Bennett had assaulted the proprietor and caused extensive property damage. Later the officers were informed by radio that Mr. Bennett had called the police station and requested a meeting with the officers at his residence.

The officers proceeded to Mr. Bennett's residence, but found no one home. As the officers were driving away from Mr. Bennett's house, a car approached them from the opposite direction. The oncoming vehicle was two to three feet left of center, and Officer Campbell had to drive onto the shoulder in order to avoid a head-on collision. As the two vehicles passed, Officer Coffman turned and identified Mr. Bennett as the driver of the other car. Officer Campbell then turned the cruiser around and pursued the Bennett vehicle back to the Bennett house. Mr. Bennett pulled into his driveway, and as Officers Campbell and Coffman pulled up behind Mr. Bennett's car, Mr. Bennett got out from the driver's side and ran around to the back of his house. Willard Westfall remained seated in the passenger seat of the car.

Officers Coffman and Campbell searched for Mr. Bennett, but were unable to find him. The officers radioed a request for assistance to Buckhannon City Police Officer Darrell Bennett and Upshur County Deputy Sheriff Mark Cerullo. Officers Coffman and Campbell then continued to search for Mr. Bennett. After the search had proceeded for about an hour, Deputy Cerullo, who was watching the front of the Bennett residence, observed someone he believed to be Mr. Bennett enter the house. He notified the other officers, who then returned to the house.

At this time West Virginia State Trooper Dave Harris arrived, and Officers Coffman and Campbell described the foregoing events to him. They informed Trooper Harris that Mr. Bennett had committed the misdemeanor of driving under the influence of alcohol in their presence, and that they believed they had the right to enter Mr. Bennett's residence without first obtaining an arrest warrant. Trooper Harris agreed. All five policemen then proceeded to the front porch of the Bennett residence, and Trooper Harris knocked on the door. Willard Westfall answered the door, and when asked whether Mr. Bennett was in the house, replied that he was not. Trooper Harris then asked Mr. Westfall whether they could enter the house. There is some disagreement regarding Mr. Westfall's reply, but it is agreed that he did not grant the officers permission to enter. Officer Coffman, Officer Campbell and Trooper Harris then entered the house and found Mr. Bennett hiding under a bed. Officer Bennett and Deputy Cerullo did not enter the residence. Mr. Bennett appeared to be intoxicated. He was placed under arrest without incident.

Officers Coffman and Campbell then transported Mr. Bennett to the Upshur County jail. Trooper Harris, Officer Bennett and Deputy Cerullo all continued about their respective duties. They had no further contact with Mr. Bennett.

At the jail, Mr. Bennett registered a .096 on the breathalyzer. Because it was Christmas Eve, Officer Coffman elected to reduce the charge from driving under the influence of alcohol to public intoxication and reckless driving. The officers then transported Mr. Bennett back to his residence.

Mr. Bennett subsequently brought this action for civil damages pursuant to 42 U.S.C. § 1983. At the end of the plaintiff's case, the court directed a verdict for the defendants. It is from this judgment that

Mr. Bennett appeals. We find no error and affirm.

## I

It has long been established that a police officer is entitled to qualified immunity from an assessment of damages against him in an action under 42 U.S.C. § 1983 if he acted with a reasonable and good faith belief that he acted lawfully. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Street v. Cherba*, 662 F.2d 1037 (4th Cir.1981); *Hill v. Rowland*, 474 F.2d 1374 (4th Cir.1973); *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 456 F.2d 1339 (2nd Cir. 1972); *Reimer v. Short*, 578 F.2d 621 (5th Cir.1978); *Jones v. Perrigan*, 459 F.2d 81 (6th Cir.1972). As Chief Justice Warren stated in his opinion for the Court in *Pierson, supra,*

> A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does.

386 U.S. at 557, 87 S.Ct. at 1219.

■ In cases decided after *Pierson*, there evolved a two-pronged test for determining whether qualified immunity was appropriate. The first prong inquired into the subjective good faith belief of the officer that his actions were lawful. The second prong inquired into the objective reasonableness of the officer's belief. *See Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). However, in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the U.S. Supreme Court eliminated the subjective prong of the test, and formulated the inquiry thus:

> We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. * * * If the law at that time was not clearly established, an official could not reasonably be expected to anticipate sub-

sequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.

*Id.* at 818, 102 S.Ct. at 2738. The policy underlying this revision of the test was one of encouraging district courts to enter summary judgment against plaintiffs bringing insubstantial claims. *See* Note, "Quick Termination of Insubstantial Civil Rights Claims: Qualified Immunity and Procedural Fairness," 38 Vanderbilt L.Rev. 1543 (1985).

The appellees in this case are therefore immune from damages *unless* they acted contrary to *clearly established* law as it existed at the time they entered Mr. Bennett's home without a warrant to arrest him for driving under the influence of alcohol.

## II

■ Initially it should be noted that an officer need not obtain an arrest warrant before arresting a person whom he has witnessed committing a misdemeanor. *State v. Lutz*, 85 W.Va. 330, 101 S.E. 434 (1919). Moreover, an officer having reasonable grounds to believe that a person has been driving while drunk may make a warrantless arrest for that offense even though the offense is not committed in his presence. *State v. Byers*, 159 W.Va. 156, 224 S.E.2d 726 (1976). The issue is thus not whether Mr. Bennett could lawfully have been arrested outside his home without a warrant—he could have. The issue is whether on 24 December 1982 it was clearly unconstitutional to enter Mr. Bennett's home without a warrant in order to effect the arrest.

In *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the U.S. Supreme Court held that, when the police have initiated a valid public warrantless arrest of a suspect, the suspect may not defeat the arrest "by the expedient of escaping to a private place." *Id.* at 43, 96 S.Ct. at 2410. In *Santana*, the defendant had been standing in the open doorway of her house when the police, who had probable cause to believe she had just distributed

heroin, pulled up in front of her house in an unmarked van, shouted "police", and displayed their badges. The defendant retreated into the vestibule of her house, and the police entered the vestibule in order to apprehend her. The Court upheld the warrantless arrest in the home under the doctrine of hot pursuit.

*Santana* was followed by the Supreme Court of Nebraska in *State v. Penas,* 200 Neb. 387, 263 N.W.2d 835 (1978). The facts of *Penas* are extraordinarily similar to those in the case at bar. A police officer in a marked cruiser observed Penas driving his van in an erratic manner. When Penas parked in front of his house, the officer pulled up behind him, got out of the cruiser, and identified himself as a police officer. Penas ran to his house, and managed to enter before the officer could apprehend him. The officer returned to his cruiser and radioed for assistance. When another officer arrived, Penas could be seen through the screen door he had entered. The officers called to Penas to come over to the door in order to talk to them. When Penas approached, the officers noted that his eyes were bloodshot and that his breath smelled of alcohol. When Penas refused to go outside, the officers opened the screen door, pulled Penas outside, and arrested him for driving while intoxicated. Following *Santana,* the Nebraska court upheld the arrest under the doctrine of hot pursuit.

The Court of Appeals of Oregon similarly followed *Santana* in *State v. Niedermeyer,* 48 Or.App. 665, 617 P.2d 911 (1980). In *Niedermeyer,* police observed Niedermeyer speeding and signaled him to pull over. Niedermeyer pulled over, but as soon as the officer got out of his cruiser, Niedermeyer sped off. The officers ran a license check on the car, identified it as Niedermeyer's, and staked out his residence. When Niedermeyer pulled up to his house, the officer attempted to arrest him. However, Niedermeyer ran into his house before he was apprehended. The officer pursued Niedermeyer into his house and placed him under arrest for the offense of "attempting to elude a police officer," "a class A misdemeanor and a major traffic offense." 617 P.2d at 913. The Oregon court upheld the arrest under the doctrine of hot pursuit. Significantly, the U.S. Supreme Court denied certiorari, 450 U.S. 1042, 101 S.Ct. 1761, 68 L.Ed.2d 239 (1981).

■ The hot pursuit doctrine set forth in *Santana* and followed in *Penas* and *Niedermeyer* is squarely applicable to this case. The officers testified that they pulled into Mr. Bennett's driveway only "about two seconds" after Mr. Bennett did. There is no testimony in the record concerning whether the officers identified themselves or ordered Mr. Bennett to stop. However, the cruiser was clearly marked, and Mr. Bennett clearly indicated by his actions that he understood that the officers had not just stopped by to borrow a cup of sugar. Moreover, Officers Coffman and Campbell immediately and continuously pursued Mr. Bennett, and did not relent in their search and pursuit until Deputy Cerullo notified them that Mr. Bennett had entered the house. Under these circumstances, the circuit court did not err in determining that the officers' belief that they could enter Mr. Bennett's house without a warrant was reasonable.

Another "exigent circumstance" generally held to justify arrests or searches that would otherwise require a warrant, is the possibility that evidence of crime will be destroyed. This "destruction of evidence" exception to the warrant requirement was recognized by the U.S. Supreme Court in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In *Schmerber,* the police, who arrested Schmerber for driving while intoxicated took a sample of Schmerber's blood over Schmerber's objection. The Court, while noting that ordinarily a warrant would be required for such an intrusion into the suspect's bodily integrity, nevertheless upheld the warrantless "search". Noting that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system," *Id.* at 770, 86 S.Ct. at 1835, the Court held the warrantless removal of the petitioner's blood was neces-

sary to prevent the destruction of the most probative evidence of Schmerber's offense.

Similarly, it was necessary in this case to administer a blood-alcohol test to Mr. Bennett as soon as he could be apprehended, so that he could not metabolize the evidence of his crime. Mr. Bennett managed to elude Officers Coffman and Campbell for nearly an hour while they pursued him. During this time Mr. Bennett presumably exerted himself significantly, all the while metabolizing as he had never metabolized before. Moreover, once in his home, Mr. Bennett could have ingested more liquor and subsequently contended that his breathalyzer result was produced, or at least substantially affected, by such in-house ingestion. The circuit court therefore did not err in determining that the officers' belief that they could enter Mr. Bennett's house without a warrant was reasonable.

The unsettled nature of the constitutional question with which the officers were confronted in deciding whether to enter Mr. Bennett's home is nicely illustrated by a similar case arising in Wisconsin. In *State v. Welsh*, 108 Wis.2d 319, 321 N.W.2d 245 (1982), Welsh, a drunk driver, had driven his car into a roadside field near his home. Another driver, who had observed Welsh's erratic driving, notified the police. When Welsh learned that the police had been notified, he abandoned his car and set out on foot. The police arrived at the scene and ran a license check on the car. Having determined that Welsh was the owner of the abandoned car, and having been informed by the observer that Welsh had appeared to be intoxicated, the police proceeded immediately to Welsh's residence. The officers entered Welsh's home without a warrant and arrested him for driving under the influence of alcohol.

The Supreme Court of Wisconsin held that the warrantless home entry did not violate Mr. Welsh's rights under the Fourth Amendment. The court held that the warrantless arrest was proper under the exigent circumstances exception to the warrant requirement because (1) the officers were in hot pursuit of a defendant

seeking to avoid a chemical sobriety test, and (2) "[W]ithout an immediate blood alcohol test, highly reliable and persuasive evidence facilitating the state's proof of [Welsh's] alleged violation ... would be destroyed." *Id.* at 338, 321 N.W.2d at 255.

The United States Supreme court granted certiorari, and reversed the decision of the Wisconsin court by a vote of 6 to 3 on 15 May 1984. The question expressly addressed in *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), was:

> whether, and if so under what circumstances, the Fourth Amendment prohibits the police from making a warrantless night entry of a person's home in order to arrest him for violation of a *nonjailable* traffic offense.

*Id.* at 742, 104 S.Ct. at 2093 (emphasis supplied). The Court held that:

> On the facts of this case ... the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of the crime.

*Id.* at 753, 104 S.Ct. at 2099. The Court further held that the "destruction of evidence" exception to the warrant requirement did not justify the warrantless entry. However, the Court expressly based this determination on its observation of the lenient treatment accorded drunk drivers in Wisconsin.

> The State of Wisconsin has chosen to classify the first offense for driving while intoxicated as a noncriminal, civil forfeiture offense for which no imprisonment is possible. * * * This is the best indication of the State's interest in precipitating an arrest, and is one that can be easily identified both by the courts and by officers faced with a decision to arrest. * * * Given this expression of the State's interest, a warrantless home arrest cannot be upheld simply because evidence of the petitioner's blood-alcohol level might have dissipated while the police obtained a warrant.

*Id.* at 754, 104 S.Ct. at 2100.

*Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), can be

distinguished from the case now before us on at least two grounds. First, in this case, the hot pursuit doctrine was clearly applicable: there was "immediate [and] continuous pursuit of the petitioner from the scene of a crime." *Id.* at 753, 104 S.Ct. at 2099. Second, in West Virginia the first offense for driving while intoxicated is not "a noncriminal, civil forfeiture offense for which no imprisonment is possible." *Id.* at 754, 104 S.Ct. at 2100. Driving while intoxicated is an offense set forth, along with negligent homicide, in Article 5 of Chapter 17C of the *West Virginia Code,* which Article is entitled "Serious Traffic Offenses." *W.Va.Code,* 17C–5–2(d) [1981], which was in effect on 24 December 1982, provided that any person driving a vehicle in this State while under the influence of alcohol

> shall be guilty of a misdemeanor, and, upon conviction thereof, shall be imprisoned in the county jail for not less than one day nor more than six months, which jail term shall include actual confinement of not less than twenty-four hours, and shall be fined not less than one hundred nor more than five hundred dollars.

*W.Va.Code,* 17C–5–2(d) [1981] thus imposed upon first offenders a *mandatory* term of imprisonment, and exposed first time drunk drivers to up to six months in jail.

Given these crucial distinctions, it may be fairly questioned whether the specific ruling in *Welsh* is at all controlling in this case. But more importantly, it must be noted that the *Welsh* case was decided by a split vote nearly 18 months *after* the arrest of Mr. Bennett. Taking into consideration: (1) the law controlling at the time of the incident; (2) the marked differences between the facts of this case and those of *Welsh;* (3) the fact that the highest courts of the States of Wisconsin and Nebraska had recently interpreted the *Constitution* in *exactly* the same manner as did the appellees in this case; and (4) the substantial difference of opinion among the jus-

tices of the U.S. Supreme Court as expressed in *Welsh* 18 months *after* this incident, there can be little doubt that the action of the officers did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, supra,* 457 U.S. at 818, 102 S.Ct. at 2738.

### III

We held in the Syllabus of *Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964):

> When the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right to recovery, the trial court should direct a verdict in favor of the defendant.

We find that Mr. Bennett failed to establish a prima facie right to recovery against the appellees. Accordingly, the trial court's direction of a verdict for the officers was proper.[1]

For the foregoing reasons, the judgment of the Circuit Court of Upshur County is affirmed.

Affirmed.

---

1. Mr. Bennett also contends that the trial court permitted the defense to elicit testimony on cross-examination that exceeded the scope of direct examination. Mr. Bennett argues that this was a violation of *W.Va.R.Civ.P.* 43(b), and constitutes reversible error. We disagree. Mr. Bennett does not argue that the testimony elicit-

ed on cross-examination was otherwise inadmissible, and such testimony clearly could have been admitted on direct examination during the defense's case. Any error in this regard was therefore not prejudicial to Mr. Bennett, and is therefore not grounds for reversal. *State v. Lane,* 168 W.Va. 490, 285 S.E.2d 138 (1981).