**STATE of Iowa, Appellant,**

v.

**Marzel JONES, Appellee.**

No. 02–0505.

Supreme Court of Iowa.

July 16, 2003.

Thomas J. Miller, Attorney General, Mary E. Tabor, Assistant Attorney General, Richard R. Phillips, County Attorney, and Alan Ostergren, Assistant County Attorney, for appellant.

Linda Del Gallo, State Appellate Defender, and Shellie L. Knipfer, Assistant State Appellate Defender, for appellee.

Andrew J. Bracken and Danielle J. Jess of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for amici curiae Iowa Association of School Boards and School Administrators of Iowa.

Catherine K. Levine, Des Moines, for amicus curiae Iowa Civil Liberties Union.

CADY, Justice.

In this appeal, we consider a number of issues arising from the search of a high school student's locker in light of the state and federal constitutional prohibitions against unreasonable search and seizure. After considering the search conducted in light of the balance between the student's privacy interest and the interest of the school in maintaining a proper educational environment, we conclude that the search was permissible and the district court

erred in suppressing evidence obtained in the course of the search.

## I. Background Facts and Proceedings.

On December 20, 2001, teachers and administrators at Muscatine High School attempted to complete an annual pre-winter break cleanout of the lockers assigned to each student at the school. The students were asked three to four days before the cleanout to report to their locker at an assigned time to open it so a faculty member could observe its contents. The general purpose of the cleanout was to ensure the health and safety of the students and staff and to help maintain the school's supplies. Accordingly, faculty assigned to examine the lockers kept an eye out for overdue library books, excessive trash, and misplaced food items. They also watched for items of a more nefarious nature, including weapons and controlled substances. The cleanout functioned as expected for approximately 1400 of the 1700 students at the school. However, a sizeable minority—including the appellee, Marzel Jones—did not report for the cleanout at their designated time.

The next day, two building aides went around to the lockers that had not been checked the day before. Acting pursuant to rules and regulations adopted by the school board, the aides opened each locker to inspect its contents. The aides did not know the names of the students assigned to the lockers they were inspecting. One of the lockers they opened contained only one item: a blue, nylon coat, which hung from one of the two hooks in the locker. Apparently curious about its ownership and concerned that it might hold trash, supplies, or contraband, one of the aides manipulated the coat and discovered a small bag of what appeared to be marijuana in an outside pocket. The aides then returned the coat to the locker and contacted the school's principal.

After crosschecking the locker number with records kept by the administration, the principal determined the locker in which the suspected marijuana was found belonged to Jones. The principal and aides then went to Jones' classroom and escorted him to his locker. Jones was asked to open the locker and, after doing so, was further asked if anything in the locker "would cause any educational or legal difficulties for him." Jones replied in the negative. The principal then removed the coat from the locker. Jones grabbed the coat, struck the principal across the arms, broke free from him, and ran away. The principal gave chase and, after three attempts, captured and held Jones until the police arrived. The police retrieved the bag and determined that it held marijuana.

Jones was later charged with possession of a controlled substance in violation of Iowa Code section 124.401(5) (2001). He subsequently filed a motion to suppress the evidence—the marijuana—obtained during the search of his locker. He claimed that the search violated his right to be free from unreasonable search and seizure pursuant to the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. The lone witness at the suppression hearing was the principal of the high school, who testified about school policy relating to search and seizure and the events of December 20 and 21. The district court granted the motion to suppress. It found that the school officials did not have reasonable grounds for searching Jones' coat pocket. The State filed a motion requesting the judge reconsider and alter his decision. The motion was denied. The State then sought discretionary review, which we granted.

## II. Standard of Review and Preservation of Error.

■ This controversy arises from an alleged violation of a constitutional right, making our review de novo. *State v. Naujoks*, 637 N.W.2d 101, 106 (Iowa 2001). In undertaking this review, we assess "the totality of the circumstances as shown by the entire record," including "the evidence presented at the suppression hearing." *Id.* Jones acknowledges the State has preserved error on all issues raised.

## III. Foundational Principles of Search and Seizure Analysis.

■ As we have recognized on numerous occasions in the past, "the Fourth Amendment exists to protect the right of the people to be free from unreasonable searches and seizures by government officials."[1] *State v. Reinier*, 628 N.W.2d 460, 464 (Iowa 2001); *see also Naujoks*, 637 N.W.2d at 106; *State v. Breuer*, 577 N.W.2d 41, 45 (Iowa 1998). The Iowa Constitution also contains a search and seizure clause that is virtually identical to the Fourth Amendment. *Compare* Iowa Const. art. I, § 8, *with* U.S. Const. amend. 4. Accordingly, we usually interpret "'the scope and purpose of article I, section 8, of the Iowa Constitution to track with federal interpretations of the Fourth Amendment.'" *Breuer*, 577 N.W.2d at 44 (quoting *State v. Showalter*, 427 N.W.2d 166, 168 (Iowa 1988)).

■ The essential purpose of both constitutional provisions "'is to impose a standard of "reasonableness" upon the exercise of discretion by government officials . . . in order "to safeguard the privacy and security of individuals against arbitrary invasion."'" *Naujoks*, 637 N.W.2d at 107 (citation omitted). In light of this purpose, we have delineated a two-part test that applies in most cases requiring the determination of whether particular governmental action violates the constitutional search and seizure provisions. *See id.* at 106 (describing our usual search and seizure analysis focused on the expectation of privacy and the reasonableness of an invasion of that privacy). However, we believe the specific facts of this case warrant an analysis that is more focused than our general approach.

■ As we observed in another context involving a search and seizure question, "it has been clear that the location of property seized by authorities may be of critical importance in determining whether the search and seizure were lawful." *State v. Flynn*, 360 N.W.2d 762, 765 (Iowa 1985). With this in mind, it is significant in this case that the search of Jones' locker occurred on school grounds. Although students maintain their constitutional rights within the school setting, the United States Supreme Court has acknowledged this setting "requires some easing of the restrictions to which searches by public authorities are ordinarily subject."[2] *New*

[1]. Neither party disputes that the building aides (and the principal) are "government officials" subject to constitutional search and seizure provisions. *See New Jersey v. T.L.O.*, 469 U.S. 325, 333, 105 S.Ct. 733, 738, 83 L.Ed.2d 720, 729 (1985) (acknowledging that the Fourth Amendment's "prohibition on unreasonable searches and seizures applies to searches conducted by public school officials"); *see also* 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 16.1, at 758–59 (3d ed.1999) (describing the "state action" requirement).

[2]. To this end, the Supreme Court has also observed, "[in] the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable 'when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."'" *Bd. of Ed. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 829, 122 S.Ct. 2559,

*Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720, 733 (1985). The Court has provided specific commentary on this "easing of the restrictions" in three cases.

In the first case, *New Jersey v. T.L.O.*, the Court articulated several baseline principles related to the search of a student in the school setting. However, *T.L.O.* focused on the search of a specific student whose property was searched based on some measure of individualized suspicion of her conduct. *See id.* at 345–47, 105 S.Ct. at 744–46, 83 L.Ed.2d at 737–38. In two subsequent cases, the Court considered the propriety of searches conducted in the absence of individualized suspicion of a particular student. *See Bd. of Ed. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735, (2002); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). In these cases, the search of the students was premised on generalized concerns about drug use prevention in light of the effect of the presence of drugs on the educational environment as a whole.

■ We believe the locker search conducted by the school officials in this case is most closely analogized to the broad searches conducted in *Acton* and *Earls*. Although this search eventually focused on Jones' locker, the process leading to that point was random and carried out with the purpose of protecting the health and safety of the whole student body to preserve a proper educational environment. Although *T.L.O.*, *Acton*, and *Earls* each provide helpful insight on search and seizure in schools, it is the sum of their holdings, crystallized in the Court's opinion in *Earls*, from which our analysis must launch. Under the *Earls* analysis, we must consider three factors: (1) "the nature of the priva-

cy interest allegedly compromised" by the search, (2) "the character of the intrusion imposed by the [search] [p]olicy," and (3) "the nature and immediacy of the [school's] concerns and the efficacy of the [search] [p]olicy in meeting them." *Earls*, 536 U.S. at 830, 832, 834, 122 S.Ct. at 2565–67, 153 L.Ed.2d at 744, 746–47 (citations omitted).

■ The upshot of this analysis, as is evidenced by the controversy arising in the present case, is that "[e]vidence obtained in violation of the Fourth Amendment is inadmissible at trial under the exclusionary rule." *Breuer*, 577 N.W.2d at 45. The district court considered the search of Jones' locker in light of a test articulated by the Court in *T.L.O.* and suppressed the evidence found in Jones' coat after concluding Jones had a reasonable expectation of privacy in the contents of his locker and that the search of the locker was unreasonable. Although we agree with some of the district court's reasoning, we disagree with its application of *T.L.O.* alone and its conclusion that the search was unreasonable and the evidence should be suppressed. We turn now to our analysis of this appeal under the *Earls* factors.

## IV. Nature of the Privacy Interest.

■ In assessing the nature of the privacy interest in this case, it is imperative to remember this controversy arose within the school context "where the State is responsible for maintaining discipline, health, and safety." *Earls*, 536 U.S. at 830, 122 S.Ct. at 2565, 153 L.Ed.2d at 745. This reality has led the Court to acknowledge that "[s]ecuring order in the school environment sometimes requires that students be subjected to greater controls than those appropriate for adults." *Id.* at 831,

2564, 153 L.Ed.2d 735, 744 (2002) (citations omitted). "Significantly, [the] Court has pre-

viously held that 'special needs' inhere in the public school context." *Id.*

122 S.Ct. at 2565, 153 L.Ed.2d at 745. Although this may be the case, we do not believe it can be said that students have no expectation of privacy in a school setting, particularly in a location such as a locker.[3]

■ The determination of the existence of a legitimate expectation of privacy is based on the unique facts of each case, focusing on " ' "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." ' " *Breuer,* 577 N.W.2d at 46 (citation omitted). In *T.L.O.,* the Court observed:

> Students at a minimum must bring to school not only the supplies needed for their studies, but also keys, money, and the necessaries of personal hygiene and grooming. In addition, students may carry on their persons or in purses or wallets such nondisruptive yet highly personal items as photographs, letters, and diaries. Finally, students may have perfectly legitimate reasons to carry with them articles of property needed in connection with extracurricular or recreational activities. In short, schoolchildren may find it necessary to carry with them a variety of legitimate, noncontraband items, and there is no reason to conclude that they have necessarily waived all rights to privacy in such items merely by bringing them onto school grounds.

*T.L.O.,* 469 U.S. at 339, 105 S.Ct. at 741, 83 L.Ed.2d at 733. However, the Court specifically avoided answering the question of whether a student "has a legitimate expec-

tation of privacy in lockers, desks, or other school property provided for the storage of school supplies." *Id.* at 337 n. 5, 105 S.Ct. at 740 n. 5, 83 L.Ed.2d at 732 n. 5. Likely due in part to the absence of an authoritative statement on this issue, various courts considering it have produced a divergence of opinion. Some courts have concluded that there is no expectation of privacy in a student locker, particularly in situations in which there exists a school or state regulation specifically disclaiming any privacy right. *See In re Patrick Y.,* 358 Md. 50, 746 A.2d 405, 414 (2000); *Shoemaker v. State,* 971 S.W.2d 178, 182 (Tex.App.1998); *In re Isiah B.,* 176 Wis.2d 639, 500 N.W.2d 637, 641 (1993); *see also Zamora v. Pomeroy,* 639 F.2d 662, 670–71 (10th Cir.1981); *State v. Stein,* 203 Kan. 638, 456 P.2d 1, 3 (1969); *People v. Overton,* 24 N.Y.2d 522, 301 N.Y.S.2d 479, 249 N.E.2d 366, 368 (1969). Other courts have concluded that a student does have a legitimate expectation of privacy in the contents of a school locker, even if a school or state regulation exists. *See In re Interest of S.C.,* 583 So.2d 188, 191–92 (Miss.1991); *In re Adam,* 120 Ohio App.3d 364, 697 N.E.2d 1100, 1106–07 (1997); *In re Dumas,* 357 Pa.Super. 294, 515 A.2d 984, 985–86 (1986); *see also Commonwealth v. Snyder,* 413 Mass. 521, 597 N.E.2d 1363, 1366 (1992); *State v. Joseph T.,* 175 W.Va. 598, 336 S.E.2d 728, 736 (1985); *In re Isiah B.,* 500 N.W.2d at 648 (Bablitch, J., concurring) ("Negating a constitutional 'expectation' of privacy based upon whether or not a person was notified of the impending search

---

**3.** Although the Supreme Court has not expressly articulated the method by which the nature of a privacy interest should be measured in this context, the Court has used the language of "typical" search and seizure analysis and referred to legitimate expectations of privacy in discussing the issue. *See Earls,* 536 U.S. at 831–32, 122 S.Ct. at 2565–66, 153 L.Ed.2d at 745–46; *Vernonia Sch. Dist. 47J v.*

*Acton,* 515 U.S. 646, 654, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564, 575 (1995). The measure of a legitimate expectation of privacy is a calculus based on established principles with which we are familiar, and we believe it provides the best method by which to measure the nature of a privacy interest. We therefore expressly adopt it as the measure of the nature of the privacy interest in this context.

sets a dangerous precedent for intrusions upon Fourth Amendment rights."). In this case, both Muscatine school district policy[4] and state law[5] clearly contemplate and regulate searches of school lockers. Nevertheless, we believe Jones maintained a legitimate expectation of privacy in the contents of his locker.

■ *T.L.O.* involved the search of a student's purse, but a student's locker presents a similar island of privacy in an otherwise public school. *See* William G. Buss, *The Fourth Amendment and Searches of Students in Public Schools,* 59 Iowa L.Rev. 739, 773 (1974). Numerous permissible items of a private nature are secreted away within a locker on a daily basis with the expectation that those items will remain private. *See id.; see also In re Adam,* 697 N.E.2d at 1108; *In re Dumas,* 515 A.2d at 985. In fact, Muscatine's school policy effectively presumes this to be the case and protects this interest: in those situations in which the school seeks to search a locker, the school's rules contemplate the presence of the student or at least a "waiver" of the student's opportunity to be present and supervising the search. Moreover, the school rules and state law related to search and seizure in schools are premised on a presumption of privacy; such legislation would likely be unnecessary if no expectation of privacy existed in the first place. Each of these factors indicates a broad societal recognition of a legitimate expectation of privacy in a school locker. Accordingly, we conclude that a student such as Jones has a measure of privacy in the contents of his locker.

## V. Character of the Intrusion.

We must next "consider the character of the intrusion imposed by the [search] [p]ol-

---

4. Muscatine Community School District policy 502.7 provides, in part:

> All school property is held in public trust by the Board of Directors. School authorities may, without a search warrant, search students, student lockers, personal effects, desks, work areas or student vehicles. The search shall be in a manner reasonable in scope to maintain order and discipline in the schools, promote the educational environment, and protect the safety and welfare of students, employees and visitors to the school district facilities....
> *Locker Searches*
> *Inspections*—Although school lockers are temporarily assigned to individual students, they remain the property of the school district at all times. The school district has a reasonable and valid interest in insuring that the lockers are properly maintained. For this reason periodic inspections of lockers is permissible to check for cleanliness and vandalism. Periodic inspections of all or a random selection of lockers may be conducted by school officials in the presence of the student. Any contraband discovered during such searches shall be confiscated by school officials and may be turned over to law enforcement officials.

> *Searches*—The student's locker and its contents may be searched when a school official has reasonable and articulable suspicion that the locker contains illegal, or contraband items. Such searches should be conducted in the presence of another adult witness, when feasible.

> Muscatine high school officials also post "Notice to Search" fliers around the school indicating, "Students should be aware their assigned lockers will be jointly accessible to the student and school officials. Lockers may be subject to search at the discretion of school officials."

5. Iowa Code section 808A.2(2) (2001) provides, in part:
> 2. School officials may conduct periodic inspections of all, or a randomly selected number of, school lockers, desks, and other facilities or spaces owned by the school and provided as a courtesy to a student. The furnishing of a school locker, desk, or other facility or space owned by the school and provided as a courtesy to a student shall not create a protected student area, and shall not give rise to an expectation of privacy on a student's part with respect to that locker, desk, facility, or space....

icy." *Earls,* 536 U.S. at 832, 122 S.Ct. at 2566, 153 L.Ed.2d at 746. The district court concluded the actions of the school officials were overly intrusive in light of what the court perceived to be unreasonable grounds to search Jones' particular locker. However, we believe the locker search was not overly intrusive, especially in light of the underlying governmental interest and broader purpose of the search.

The locker cleanout was premised on the need to maintain a proper educational environment, which school officials had determined was undermined by violations of school rules and potential violations of the law. Most students cooperated in the school's efforts to check the lockers for such violations. Although there was no indication that students on the day of the original cleanout had the contents of their lockers searched, the students were also present and supervised by a teacher who was responsible for observing the contents of the locker and ensuring the cleanout functioned as planned. Moreover, the teacher supervisors surely could have communicated with a student present at the locker about its contents and taken further steps if the situation warranted.

The search on the second day came under different circumstances. The advantage of carrying out the cooperative cleanout and inspection of the previous day had passed. Students who had been advised that they were to report to their lockers for a cleanout had failed to do so, and caused the school to switch to an alternative method to ensure the cleanout was achieved. On entering Jones' locker, the only item in sight was the blue coat. The school officials believed that trash, supplies, or other items could be in the coat pockets, and did not have the advantage of turning to Jones to ask him about its contents, as they likely could have done the day before. For this reason, they decided to make a cursory check of the coat for such items. Although they found the bag of marijuana, they just as well could have found a banana peel. The scope of the search was supported by the underlying purpose of the search.

 While it is possible that there would have been alternative ways to check the coat's contents, constitutional search and seizure provisions do not require the least intrusive action possible. *See id.* at 837, 122 S.Ct. at 2569, 153 L.Ed.2d at 749; *Shade v. City of Farmington,* 309 F.3d 1054, 1061 (8th Cir.2002); *Breuer,* 577 N.W.2d at 49–50. Instead, they require a measure of "reasonableness, under all the circumstances." *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742, 83 L.Ed.2d at 734. Under this standard, we conclude the search of the contents of Jones' locker was not overly intrusive.

## VI. Nature and Immediacy of School's Concerns and Efficacy of Search Policy in Meeting Them.

The education of the students of the State of Iowa is a profound responsibility vested, ultimately, in the capable hands of local teachers, administrators, and school boards. What may be a daunting task to begin with is only made more difficult by the presence of various distractions ranging from excessive trash and missing supplies to—potentially—more troublesome items, such as controlled substances or weapons. What was observed by the Court in *T.L.O.* nearly twenty years ago remains true—if not truer—today: "Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems." *See id.* at 339, 105 S.Ct. at 741, 83

L.Ed.2d at 733. These developments serve as the backdrop against which the conduct of school officials must be considered, especially as it relates to their duty to educate students while also protecting them from numerous threats to that mission. *See id.* ("Against the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds.").

The principal of the school testified that the annual winter break locker cleanout was conducted by the school to prevent violations of both school rules related to the accumulation of trash and school supplies and the sharing of lockers and the law related to possession of controlled substances and weapons. School officials were aware that students tended to accumulate excessive trash and supplies in their lockers and sometimes shared the lockers against school policy. Moreover, they knew that if controlled substances or weapons were present in the school, either type of item would present a threat to the school environment that they were responsible for maintaining.

To counteract the problems caused by these items, the school presented reasonable notice to the student body and attempted to check the lockers with student assistance. Some students, including Jones, did not follow this procedure and left the school with little choice of methods by which it could carry out what it considered to be a legitimate method by which school rules could be maintained. Although the school did not have individualized suspicion of rule or law violations before the locker cleanout operation, constitutional search and seizure provisions include no irreducible requirement that such suspicion exist. *See Earls,* 536 U.S. at 829, 122 S.Ct. at 2564, 153 L.Ed.2d at 744 (citation omitted); *Acton,* 515 U.S. at

653, 115 S.Ct. at 2391, 132 L.Ed.2d at 574–75 (citing *T.L.O.,* 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8, 83 L.Ed.2d at 735 n. 8). Moreover, it would be contrary to the mission of our educational system to force schools to wait for problems to grow worse before allowing steps to be taken to prevent those problems. *See Earls,* 536 U.S. at 835–36, 122 S.Ct. at 2568, 153 L.Ed.2d at 748. Given the public school context in which this controversy arose and the present realities of public education, we conclude that the search conducted by school officials was proper.

## VII. Conclusion.

■ Although students are not stripped of constitutional protections in the school context, those protections must be balanced against the necessity of maintaining a controlled and disciplined environment in which the education of all students can be achieved. Thus, while students maintain a legitimate expectation of privacy in the contents of their school locker, that privacy may be impinged upon for reasonable activities by the school in furtherance of its duty to maintain a proper educational environment. The search of Jones' locker was permissible in light of these principles, and the district court's grant of a motion to suppress evidence obtained during the search was in error. For that reason, we reverse the decision of the district court and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**