**STATE of Iowa, Appellee,**

v.

**Sheila Ann LOVIG, Appellant.**

No. 02–2034.

Supreme Court of Iowa.

Feb. 25, 2004.

Matthew T. Lindholm of Hoyt Law Firm, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, Stephen Holmes, County Attorney, and Mary Howell Sirna, Assistant County Attorney, for appellee.

CADY, Justice.

In this appeal, we consider whether the district court properly denied the defendant's motion to suppress evidence gar-

nered through a warrantless search of an apartment. The district court determined that probable cause and an exigent circumstance existed to justify the limited entry into the apartment by law enforcement officers. The defendant challenges this finding on appeal and seeks suppression of the evidence. For the reasons that follow, we reverse the decision of the district court and remand for further proceedings.

## I. Background Facts and Proceedings.

Shortly after 9:00 p.m. on March 29, 2002, deputy Brian Tickle (Tickle) was dispatched to the scene of a single-vehicle rollover accident near Story City. When Tickle arrived at the scene, he found a red Pontiac Grand Am resting on its top in a roadside ditch. The driver of the vehicle was no longer present, but three witnesses and two other law enforcement officers were at the scene. One of the witnesses told Tickle that she spoke with the female driver of the overturned vehicle in an effort to ascertain whether the driver needed medical assistance. At the time of the conversation, this person was sitting in a Chevrolet Blazer that was also at the scene. The witness noticed that the woman's breath smelled strongly of alcohol. She asked the driver of the Blazer whether she should call for emergency assistance and he responded that she should not call. After the witness advised them that she had, in fact, already called, the Blazer quickly sped away.

After acquiring this and other information from the witnesses at the scene, the officers checked the license plate numbers of the Grand Am and the Blazer. The Blazer came back registered to Price Barker (Barker). The Grand Am was registered to the defendant, Sheila Ann Lovig (Lovig). The two other officers at the scene, officer Jerry Spencer (Spencer) and

deputy Mike Miller (Miller), eventually left to pursue the Blazer and its occupants. Tickle processed the accident scene, examining it and taking photographs and witness statements. While examining the area, Tickle found an open bottle of beer, containing a small amount of alcohol, outside of the vehicle. Inside the vehicle, he found five empty bottles of beer in a grocery bag.

Meanwhile, Spencer found and interviewed Barker, the driver of the Blazer. Barker told the officer that Lovig had been driving the Grand Am and admitted that he had taken her away from the scene in his Blazer. He also told Spencer that Lovig had exited the Blazer as soon as they had reached town and that he did not know where she was presently. Spencer then interviewed members of Lovig's immediate family to find out whether any of them had seen her. Lovig's brother advised the officer that they should contact Tanya Hopkins (Hopkins), her cousin, with whom Lovig occasionally stayed, to find out whether she had seen Lovig.

Spencer went to Hopkins' apartment. As he approached the door, he heard two females, including one he recognized as Hopkins, discussing a recent phone call from Lovig's sister-in-law informing them that officers may be on their way to the residence. Hopkins told the other woman that the woman needed to leave before the officers arrived. After listening for a couple minutes, Spencer knocked on the door and Hopkins answered. Spencer asked to speak to Lovig and Hopkins claimed she was alone in the apartment with her two small children. Spencer continued to talk to Hopkins in hopes that she would be more cooperative. At one point, Hopkins closed the door, explaining that she wanted to check on something. After waiting for a moment, the officer knocked again and Hopkins again answered. At some point,

Spencer called for back-up assistance, and deputies Noel Raufaste (Raufaste) and Tickle arrived shortly after 11:00 p.m.

Both Spencer and Raufaste asked Hopkins several times if Lovig was in the apartment and requested that they be allowed inside or for Lovig to come outside. Hopkins told them that they could not come inside and that no one would come outside because she did not want "Sheila" to get in trouble. Eventually, Raufaste told Hopkins that Lovig was already in trouble and warned Hopkins that her further failure to cooperate could result in charges being filed against her related to interfering with the officers' investigation. At this point, Hopkins allowed the officers into the apartment.

After they entered the apartment, the officers established that Lovig was in a back bedroom, behind a locked door. The officers knocked on the bedroom door and asked Lovig to come out. When she refused, Raufaste threatened to force the door down. Lovig then opened the door and was arrested. She was later charged with operating a motor vehicle while intoxicated (OWI), second offense, an aggravated misdemeanor punishable by at least seven days of incarceration and a fine of at least $1500. Iowa Code §§ 321J.1, 321J.2(2)(b) (2001); see also id. § 903.1(2) (providing the maximum penalties for an aggravated misdemeanor: imprisonment not to exceed two years and a fine of no more than $5000).

On July 15, 2002, Lovig filed a motion to suppress any and all evidence in her case, alleging, among other claims, a violation of her Fourth Amendment right to be free from unreasonable search and seizure. At a subsequent hearing on her motion, Lovig withdrew all of the allegations in her written motion and was permitted by the district court to make a verbal amendment to the motion. In its ruling on the motion, the district court characterized the verbal amendment as alleging solely "that a warrantless search of an apartment leased by [Hopkins], resulting in the seizure and arrest of the defendant was an unconstitutional search in violation of the defendant's rights under the Fourth Amendment."

The district court went on to decide that, while the circumstances surrounding Lovig's arrest did not appear to be constitutionally permissible at first blush, the high state interest in preventing individuals from operating a motor vehicle while intoxicated, coupled with information related to the effect a delayed arrest may have on the amount of alcohol in a person's body, supported the officer's limited entry into the apartment. The district court denied the motion to suppress. After the district court's ruling, Lovig signed a waiver of jury trial and stipulated to a trial on the minutes of testimony in her case. She was found guilty of OWI, second offense, and was sentenced to a term not to exceed two years with all but seven days suspended and was also fined and ordered to pay additional fees and court costs.

Lovig appeals, seeking suppression of the evidence garnered through the officer's search of Hopkins' apartment. She argues that she had a legitimate expectation of privacy in Hopkins' apartment based on evidence that she regularly visited there and occasionally spent the night when she was not staying with her boyfriend. For this reason, she asserts, probable cause and exigent circumstances must have existed in her case to justify a search. She believes these factors cannot be established because the law enforcement officers lacked probable cause to believe evidence pertaining to a crime would be located in the apartment and a sufficient exigency did not arise at any point in time.

The State resists and counters each of Lovig's arguments. It asserts first that Lovig did not have a legitimate expectation of privacy in Hopkins' apartment because she had an insufficient connection to the apartment for an expectation of privacy to arise. In the alternative, the State argues that officers had probable cause to believe that Lovig had committed a crime supporting their warrantless entry into the apartment. Further, the State contends that any further delay in finding and arresting Lovig could have resulted in an alteration to the evidence of her alcohol consumption, creating an exigent circumstance warranting a limited search of the apartment. The State believes that, on the whole, the search conducted in this case was reasonable and the evidence was admissible. As we explain further below, we disagree.

## II. Standard of Review and Preservation of Error.

■■■ "Appellate review of claimed violations of constitutional rights under the Fourth Amendment is de novo in light of the totality of the circumstances." *State v. Walshire*, 634 N.W.2d 625, 626 (Iowa 2001). In undertaking our review, we assess the entire record, including evidence presented during the suppression hearing and by way of stipulation. *See State v. Jones*, 666 N.W.2d 142, 145 (Iowa 2003). While "[w]e are not bound by the district court's determinations, . . . we may give deference to its credibility findings." *State v. Naujoks*, 637 N.W.2d 101, 106 (Iowa 2001). The adverse ruling on Lo-

vig's motion to suppress preserved error for our review. *See id.*

## III. Foundational Principles of Search and Seizure Analysis.

■■■ "The Fourth Amendment of the United States Constitution secures the right of people to be free from unreasonable search and seizure."[1] *Id.* Accordingly, we have determined that "[t]he essential purpose of the Fourth Amendment 'is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law enforcement agents[,] in order "to safeguard the privacy and security of individuals against arbitrary invasion." ' " *Id.* at 107; *accord Jones*, 666 N.W.2d at 145; *State v. Legg*, 633 N.W.2d 763, 768 (Iowa 2001) ("The 'central requirement' of the Fourth Amendment is reasonableness." (Citation omitted.)). In measuring the reasonableness of any search and seizure, we look to

> [w]hether the thing done [by government officials], in the sum of its form, scope, nature, incidents and effect, impresses as being fundamentally unfair or unreasonable in the specific situation when the immediate end sought is considered against the private right affected.

*Naujoks*, 637 N.W.2d at 107 (citation omitted).

■■■ We have delineated a two-part test for analyzing whether particular government action was unreasonable and in violation of the Fourth Amendment. *Id.* at 106. We first "determine whether the person challenging the warrantless search

---

1. Article one, section eight of the Iowa Constitution also protects against unreasonable search and seizure. *State v. Jones*, 666 N.W.2d 142, 145 (Iowa 2003); *State v. Legg*, 633 N.W.2d 763, 765 n. 1 (Iowa 2001). In fact, Iowa's constitutional provision tracks closely with the Fourth Amendment and we have often interpreted both in a similar fash-

ion. *See Jones*, 666 N.W.2d at 145; *Legg*, 633 N.W.2d at 765 n. 1; *State v. Breuer*, 577 N.W.2d 41, 44 (Iowa 1998). Such an interpretation is unnecessary in this case, however, because Lovig makes no claim that her constitutional rights under the Iowa Constitution have been violated.

has a legitimate expectation of privacy in the premises searched." *Id.* This expectation of privacy must be shown to exist both subjectively and objectively. *Id.* If this expectation exists, "we proceed to the second step which requires us to determine whether the State has 'unreasonably invaded that protected interest.'" *Id.* (quoting *State v. Breuer,* 577 N.W.2d 41, 45 (Iowa 1998)).

 Warrantless searches and seizures are per se unreasonable and prohibited unless the State proves by a preponderance of the evidence "that officers acted reasonably under one of the recognized exceptions to the warrant requirement articulated" by the United States Supreme Court. *State v. Predka,* 555 N.W.2d 202, 206 (Iowa 1996) (citing *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967)); *accord Legg,* 633 N.W.2d at 767. "These exceptions include 'searches based on consent, plain view, . . . [probable cause coupled with] exigent circumstances[,] and searches incident to arrest.'" *Legg,* 633 N.W.2d at 767 (quoting *Breuer,* 577 N.W.2d at 45). The only one of these exceptions at issue in this case is "[probable cause coupled with] exigent circumstances." *Id.* We now turn to an application of these various principles of search and seizure analysis to the facts of this case.

### IV. Legitimate Expectation of Privacy.

 The determination of "[w]hether a person has a legitimate expectation of privacy concerning a specific area is made on a case-by-case basis, considering the unique facts of each situation." *Id.* In considering each case, we do not ask "'whether the individual has chosen to conceal some private activity but "whether the government's intrusion infringes upon the personal and societal values protected

by the Fourth Amendment."'" *Breuer,* 577 N.W.2d at 46 (citation omitted).

 Perhaps the clearest value protected by the Fourth Amendment is "'physical entry of the home[,] the chief evil against which the wording of the Fourth Amendment is directed.'" *Legg,* 633 N.W.2d at 767 (citation omitted). Although each case is unique, we have previously acknowledged, "a legitimate expectation of privacy extends beyond a person's home, to afford protection to even an overnight guest in their host's home." *Naujoks,* 637 N.W.2d at 107 (citing *Minnesota v. Olson,* 495 U.S. 91, 99–100, 110 S.Ct. 1684, 1689–90, 109 L.Ed.2d 85, 95 (1990)). Of course, we have also observed "[a] guest does not have a legitimate expectation of privacy if he is on the premises merely to conduct a business transaction." *Id.* (citing *Minnesota v. Carter,* 525 U.S. 83, 91, 119 S.Ct. 469, 474, 142 L.Ed.2d 373, 381 (1998)).

Lovig argues that she had a legitimate expectation of privacy in Hopkins' apartment because she spent, on average, three nights a week at the apartment in addition to regular visits, kept some personal effects there, and when she stayed overnight at the apartment, slept in the bedroom in which she was found. The State counters that—at most—Lovig's status in relation to the apartment falls somewhere in between being an overnight social guest and a transitory business guest and she is thus not entitled to the presumptive expectation of privacy accorded overnight guests. It notes that Lovig was not necessarily staying at the apartment the night of the search, gave the officers another address as her home address when arrested, and had at least three addresses to which she had some connection as a "home." It believes Lovig's connection to the apartment on the night of the search was limited to

the apartment being merely a convenient place to hide from the officers.

While we agree with the State that the nature of Lovig's relationship to the apartment generally falls in between the status of an overnight social guest and transitory business guest, we disagree that this factor necessarily indicates that she did not have a legitimate expectation of privacy in the apartment. Lovig was a regular guest at the apartment. In addition to keeping personal effects there and staying overnight an average of three nights a week, Lovig testified that she was frequently at the apartment to baby-sit Hopkins' children or to socialize with her cousin and allow her child to spend time with Hopkins' children. Each of these circumstances, conveyed through Lovig's own testimony, indicate that she clearly had a subjective expectation of privacy in the apartment. We also believe a legitimate expectation of privacy existed from an objective standpoint. Lovig was not at the apartment to conduct a business transaction, but instead had a regular, fixed status as a social guest. Lovig's status in relation to the apartment was such that a reasonable person would recognize that she had a legitimate expectation of privacy in the apartment.

■ The record is not entirely clear whether Lovig intended to be an overnight guest on the evening she was discovered in the apartment. Nevertheless, we do not believe that this factor alone is determinative of the legitimacy of her expectation of privacy. Instead, we consider all of the circumstances in the record to determine " ' "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." ' " *Breuer*, 577 N.W.2d at 46 (citation omitted). When considering the circumstances in this case in light of the values protected by the Fourth

Amendment, we conclude that, ultimately, Lovig's status was closer to that of an overnight social guest than a transitory business guest and she held a legitimate expectation of privacy in the apartment.

## V. Probable Cause.

■ We have defined probable cause to make an arrest this way:

Probable cause is not determined by observation of and reliance on any particular factor. Probable cause to make an arrest turns upon the circumstances of each case. The facts must give rise to something more than a mere suspicion, but they need not be so strong as to convince officers involved in the arrest of a suspect's guilt. Probable cause exists if the totality of the circumstances as viewed by a reasonable and prudent person would lead that person to believe that a crime has been or is being committed and that the arrestee committed or is committing it.

*Predka*, 555 N.W.2d at 205 (quoting *State v. Bumpus*, 459 N.W.2d 619, 624 (Iowa 1990)). In considering whether probable cause existed in this case, we remember the established principle that "the knowledge of one peace officer, acting in concert with other peace officers, is presumed to be shared with all." *Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 770 (Iowa 2002).

While Lovig contends that the law enforcement officers did not have probable cause to effectuate her arrest, we believe there are numerous facts and circumstances in this case that indicate that probable cause existed. Lovig quickly left the scene of a single-vehicle rollover accident which involved a vehicle registered in her name and which she had been driving. Prior to Lovig leaving the scene of the accident, at least one witness smelled alcohol on her breath. *See State v. Niehaus*, 452 N.W.2d 184, 189 (Iowa 1990) ("[I]nfor-

mation imparted by a citizen informant is generally reliable."). Beer bottles were found in and near the vehicle. Each of these facts " 'viewed by a reasonable and prudent person would lead that person to believe that a crime' " —OWI—had been committed and that Lovig, the driver of the vehicle, had committed it. *Predka*, 555 N.W.2d at 205. The officers had ample probable cause to arrest Lovig.

## VI. Exigent Circumstances.

In *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), the United States Supreme Court considered a challenge to a warrantless search and seizure undertaken to arrest Welsh in his home for driving or operating a motor vehicle while under the influence of an intoxicant. Welsh's alleged violation subjected him to a noncriminal civil forfeiture proceeding with a maximum fine of $200. *Id.* at 746, 104 S.Ct. at 2095, 80 L.Ed.2d at 740. In considering whether law enforcement officers' actions in Welsh's case were reasonable, the Court observed that "[w]hen the government's interest is only to arrest for a minor offense, [the] presumption of unreasonableness [affixed to any warrantless home entry] is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." *Id.* at 750, 104 S.Ct. at 2098, 80 L.Ed.2d at 743 (footnote omitted). Thus, "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Id.* at 753, 104 S.Ct. at 2099, 80 L.Ed.2d at 745. In *Welsh*, the limited state interest in arresting the defendant—indicated by the state's chosen classification for the alleged offense and its limited potential penalty— when balanced against the state's intru-

sion made the warrantless entry into Welsh's home unreasonable. *See id.* at 753–54, 104 S.Ct. at 2099–100, 80 L.Ed.2d at 745–46.

Although the court in *Welsh* emphasized that exceptions to the warrant requirement are " 'few in number and carefully delineated,' " it left it to state courts to gauge the seriousness of each jurisdiction's OWI statutes and to use that determination in finding exigent circumstances. *See id.* at 749, 104 S.Ct. at 2097, 80 L.Ed.2d at 743 (citation omitted). In other words, the seriousness of the offense supporting the arrest is a factor in determining the existence of exigent circumstances, and we must consider the seriousness of an OWI offense in Iowa to determine exigent circumstances in this case.

Unlike the civil offense at issue in *Welsh*, first offense OWI in Iowa is classified by our legislature as a serious misdemeanor, and the offense can eventually rise to the level of a felony for subsequent convictions. Iowa Code § 321J.2(2). A serious misdemeanor OWI offense carries a maximum sentence of one year in jail and a minimum sentence of two days in jail, as well as a substantial fine. *Id.* § 321J.2(2)(*a*). Based on this legislative judgment, and the other serious consequences that can be associated with the offense, we think OWI is a relatively serious crime within the spectrum of prohibited acts in Iowa. It is the type of crime that can support a warrantless entry into a home if probable cause and exigent circumstances are present. *See Threatt v. State*, 240 Ga.App. 592, 524 S.E.2d 276, 280 (1999). Thus, we turn to further consider whether the State, in light of other factors and circumstances, has demonstrated exigent circumstances to overcome the presumption of unreasonableness attached to the warrantless entry into the apartment.

■ The State claims exigent circumstances exist in this case based on the destruction of evidence. The destruction of evidence is an acknowledged exigent circumstance to justify a warrantless entry. Moreover, we have previously recognized two ways by which the collection of evidence of an alcohol-related offense can be altered or destroyed by a delay in making an arrest. *See Legg*, 633 N.W.2d at 772. First, a suspect could ingest more alcohol, skewing the alcohol content higher and corrupting any evidence of prior consumption.[2] *Id.* Second, the blood alcohol level naturally dissipates during a delay. *Id.* Thus, the State claims that, considering the seriousness of the offense, the destruction of evidence resulting from a delay in obtaining a warrant justified the warrantless entry into the apartment.

We observe a split of authority in those jurisdictions that have had an opportunity to consider the issue of a warrantless entry into a home to arrest an OWI suspect following the Supreme Court decision in *Welsh.* *Compare State v. Paul*, 548 N.W.2d 260, 265–68 (Minn.1996); *City of Kirksville v. Guffey*, 740 S.W.2d 227, 228–29 (Mo.Ct.App.1987); *People v. Odenweller*, 137 A.D.2d 15, 527 N.Y.S.2d 127, 129–30 (1988); *Stark v. N.Y. State Dep't of Motor Vehicles*, 104 A.D.2d 194, 483 N.Y.S.2d 824, 826–27 (1984); *City of Orem v. Henrie*, 868 P.2d 1384, 1388–94 (Utah Ct.App.1994); *State v. Komoto*, 40 Wash. App. 200, 697 P.2d 1025, 1032–33 (1985); *Bennett v. Coffman*, 178 W.Va. 500, 361 S.E.2d 465, 468–70 (1987) *with Patzner v. Burkett*, 779 F.2d 1363, 1367–69 (8th Cir. 1985); *Norris v. State*, 338 Ark. 397, 993 S.W.2d 918, 920–24 (1999); *State v. Bolte*, 115 N.J. 579, 560 A.2d 644, 653–55 (1989); *City of Elyria v. Tress*, 73 Ohio App.3d 5,

595 N.E.2d 1031, 1034 (9 Dist.1991); *State v. Flegel*, 485 N.W.2d 210, 214–15 (S.D. 1992). Yet, while it appears the majority of these jurisdictions have found an entry to be permissible, we observe that most of these cases included the presence of other factors, most notably hot pursuit by police. *See Paul*, 548 N.W.2d at 265–68; *City of Kirksville*, 740 S.W.2d at 228–29; *Odenweller*, 527 N.Y.S.2d at 129–30; *Stark*, 483 N.Y.S.2d at 826–27; *City of Orem*, 868 P.2d at 1391–94; *Komoto*, 697 P.2d at 1032–33; *Bennett*, 361 S.E.2d at 468–70. In fact, the presence of hot pursuit is often a driving force in the analysis.

■ We think the absence of hot pursuit in this case requires us to carefully examine the claim of destruction of evidence. In doing so, we first observe that a defendant is permitted to refuse a chemical test. *See* Iowa Code § 321J.9 (refusal to submit to chemical testing). Thus, the claim of destruction of evidence in the context of blood alcohol content testing may be illusory. *See id.* *But see id.* § 321J.10 (tests may still be made pursuant to a search warrant); *Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908, 919–20 (1966) (warrantless blood test for alcohol content reasonable where delay would have led to loss of evidence). Additionally, unlike hot pursuit, the time lapse achieved by a suspect who successfully reaches the comforts of home without police in hot pursuit necessarily provides a suspect with two of the three means of destruction that would still exist even if a warrantless entry was made once police arrived. Furthermore, the natural dissipation of the blood alcohol level of a person is an aspect of most every OWI case, and cannot be properly assessed without some reference to

---

**2.** We also recognize a delay could also provide a suspect with an opportunity to simply assert a claim of additional alcohol consump-

tion even if more alcohol was not consumed, throwing any evidence of prior consumption into doubt.

the time frame in which a chemical test can be administered. Thus, the actual time to obtain a warrant becomes the important factor. If the time is relatively short, fear over too much dissipation will be alleviated. Furthermore, just as an expert can provide testimony at trial to explain the degree blood alcohol levels decline over time, the same expert can use any blood alcohol level finally obtained after the execution of a warrant to extrapolate back to arrive at a blood alcohol level earlier in time. All these factors suggest that the destruction of evidence claim may not be compelling in all OWI cases. "[S]pecific, articulable grounds [must exist] to justify a finding of exigency." *Naujoks,* 637 N.W.2d at 109; *see also* Barbara C. Salken, *Balancing Exigency and Privacy in Warrantless Searches to Prevent Destruction of Evidence: The Need for a Rule,* 39 Hastings L.J. 283, 303 (1988) (discussing the fact-based exigency analysis deployed by some federal courts of appeals).

In this case, there was evidence that Lovig had been in the apartment for a period of time before police arrived. Moreover, there was no evidence concerning any efforts by police to seek a warrant or to determine the amount of time it would take to secure a warrant. Additionally, there was no evidence that police suspected Lovig was engaged in any purposeful activity within the apartment that would destroy the integrity of any future chemical tests.

Considering all of the circumstances, we find they did not support a warrantless entry into the apartment. Although the crime of OWI is a comparatively serious matter, we are unable to find exigent circumstances under the record in this case. Exigent circumstances did not exist merely because Lovig's "blood-alcohol level might have dissipated while the police ob-

tained a warrant." *Norris,* 993 S.W.2d at 924.

## VII. Conclusion.

We reverse the decision of the district court.

**REVERSED AND REMANDED.**

All justices concur except WIGGINS, J., who takes no part.